AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | )     Case No.  13-MJ-**2168** (MBB) |
| The Boston Society of the New Jerusalem Church, 140 Bowdoin Street, Boston, MA 02108 | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

     I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ___County of Suffolk___ District of ___Massachusetts___ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

    The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

     ☑ evidence of a crime;

     ☑ contraband, fruits of crime, or other items illegally possessed;

     ☑ property designed for use, intended for use, or used in committing a crime;

     ☐ a person to be arrested or a person who is unlawfully restrained.

    The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. 1341, 1343, 1512, 1951, 1956, 1962; 26 U.S.C. 7206;21 U.S.C. 841 | Mail and Wire Fraud, Obstruction of Justice, Extortion, Money Laundering, Racketeering, False Tax Returns, Narcotics Trafficking |

    The application is based on these facts:

SEE ATTACHMENT C

     ☑ Continued on the attached sheet.

     ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

                                                                               *Applicant's signature*

                                                Krista L. Corr, FBI Special Agent
                                               *Printed name and title*

Sworn to before me and signed in my presence.

Date: _____05/01/2013 @ 5:23 PM_____

                                    Marianne B. Bowler, USMJ
                                        *Judge's signature*

City and state:  Boston, Massachusetts

                         MAGISTRATE JUDGE MARIANNE B. BOWLER
                                      *Printed name and title*

## ATTACHMENT A
### (CHURCH SEARCH WARRANT)

The Boston Society of the New Jerusalem Church is located at 140 Bowdoin Street, Boston, Massachusetts (hereinafter, the "CHURCH"). The CHURCH and the Bostonview Apartments are located within the same building, which is a single building, with the address, 130-140 Bowdoin Street on Beacon Hill in Boston, almost directly across from the staff entrance to the Massachusetts State House. The building stands 18 stories and has a brick façade. At the street level, four decorative concrete pillars extend up the front center of the building and support an off-white, wooden A-frame sign which reads, "Swedenborgian" and below it, "Church On The Hill." Under the A-frame sign, between the two middle pillars is a set of double wooden door under an arched window and a sign that reads "BOSTON SOCIETY OF THE NEW JERUSALEM." To each side of the wooden doors, set between the outer pillars, is a single rectangular window set below an arched window. There is a flower box located beneath each of these two windows. To the left and below the A-frame sign is an off-white wooden portico that is set above a single door and an arched window. Markings on the front of this portico identify the address as "130" and below it, "Bowdoin Street." This doorway is further identified with the words, "BOSTONVIEW APARTMENTS." Immediately to the left of the entrance to 130 Bowdoin Street is the driveway leading into the building's parking garage. To the right and below the A-frame sign is an off-white wooden portico that is set above a single door and an arched window. Markings on the front of this portico identify the address as "140" and below it, "Bowdoin Street." This doorway is further identified with the words, "NEW JERUSALEM CHURCH ENTRANCE." Photographs of the CHURCH are attached hereto as **Exhibit A.**

# EXHIBIT A





**ATTACHMENT B**
(CHURCH SEARCH WARRANT)

I.      The records and items sought from the Boston Society of the New Jerusalem Church, 140 Bowdoin Street, Boston, MA are more particularly described as the evidence, fruits and instrumentalities of violations of: (A) Title 18, United States Code, Section 1341 (mail fraud); (B) Title 18, United States Code, Section 1343 (wire fraud); (C) Title 18, United States Code, Section 1951 (interference with commerce by extortion); (D) Title 18, United States Code, Section 1962 (racketeering); (E) Title 18, United States Code, Section 1956 (money laundering); (F) Title 26, United States Code, Section 7206(1) (subscribing to false tax returns); (G) Title 18, United States Code, Section 1512 (obstruction of justice); (H) Title 31, United States Code, Section 5324 (structuring currency transactions); (I) Title 21, United States Code, Section 841 (narcotics trafficking); and (J) conspiracy to commit these offenses, some in violation of Title 18, United States Code, Section 371, to include:

a.  Documents, records, correspondence, contracts and agreements, personnel files, bid proposals, job specifications, invoices and bills, budgets, ledgers, accounting records, tax records, tax forms, tuition payment and tuition grant records, memoranda, notes, e-mails, telephone messages, diary and calendar entries, board minutes, trustee minutes, council minutes, by-laws, charters, certificates of incorporation, membership rolls, membership records and other information, from January 1, 2002 to the present, pertaining to the following:

[continued on following page.]

| | |
|---|---|
| a. Edward J. Mackenzie, Jr. | a.    Fillabuster Catering Trust |
| b. Courtney Mackenzie | b.    Fillabusta Food Service |
| c. Carolyn Mackenzie | c.    Courmac Realty Trust |
| d. Ronald Mackenzie | d.    Mackenzie Construction |
| e. Ronald Mackenzie, Jr. | e.    E/M/R (aka E/M) [real estate consulting |
| f. Maria Mackenzie | and construction] |
| g. Lauren Mackenzie | f.    Harborview Real Estate Corporation |
| h. Krystal Donnelly (aka Krystal MacDonald) | g.    Space Propulsion Systems, Inc. |
| i. Thomas J. Kennedy | h.    MZA Trust |
| j. John Burke | i.    Boston Society of the New Jerusalem, |
| k. Doug Hanson | Inc. |
| l. Michael Snedecker | j.    Bostonview Corp. Board |
| m. Jack Snedecker | k.    BVC Trust |
| n. Martin Raffol | l.    Looney & Grossman |
| o. Mathew Raffol | m.    Low Overhead Discount Carpet |
| p. Lindsey Raffol | n.    Metro City Painting Services, Inc. |
| q. Michael Travers | o.    ASAP Plumbing and Heating |
| r. Robert Hynes | p.    Superior Plumbing Inc. |
| s. Michael Perry | q.    Nightingale Construction Co. Inc. |
| t. Peter O'Connell | r.    Lovely Pets, Inc.; |
| u. Al Nugent | |
| v. Tina Burm | |
| w. Juan Figueroa | |
| x. Mark Palluccio | |
| y. Steven Bourgoin | |
| z. Larry Reardon | |
| aa. Marianne Baker | |
| bb. John Baker | |
| cc. Will Rodrigues | |
| dd. Christopher Hebert | |
| ee. Thomas DeRosa | |
| ff. William Lane | |
| gg. David Doherty | |
| hh. Stephen Richmond | |
| ii. John Southern | |
| jj. Steven (aka Glenn S.) Ellis | |
| kk. Rex Ellis | |
| ll. All Church tuition grant recipients | |

b. U.S. currency; and

c. Oxycodone (and records relating to oxycodone).

II.    All computer hardware, computer software, computer-related documentation, and storage media. Off-site searching of these items shall be limited to searching for the items described in paragraph I.

**DEFINITIONS**

For the purpose of this warrant:

A.   "Computer equipment" means any computer hardware, computer software, computer-related documentation, storage media, and data.

B.   "Computer hardware" means any electronic device capable of data processing (such as a computer, personal digital assistant, cellular telephone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.   "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.   "Computer-related documentation" means any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

E.   "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

F.   "Data" means all information stored on storage media of any form in any storage format and for any purpose.

G.   "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED COMPUTER EQUIPMENT**

If, after inspecting seized computer equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

**Attachment C**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STATE OF MASSACHUSETTS          :
                                :
COUNTY OF SUFFOLK               :      A F F I D A V I T

KRISTA L. CORR, being of age and duly sworn according to law, states:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and am assigned to the FBI in Boston, Massachusetts. I have been an agent with the FBI for approximately 23 years. I have participated in and conducted criminal investigations involving violations of the laws of the United States, including the laws relating to racketeering, extortion, mail fraud, bribery, money laundering, narcotics trafficking, and conspiracy. In the course of these investigations, I also have examined the personal and business records of individuals and organizations.

2. I have been involved, along with other FBI, Internal Revenue Service, Criminal Investigation Division ("IRS-CID"), and U.S. Drug Enforcement Administration ("DEA") special agents, in the investigation of the conduct of individuals, including Edward J. MacKenzie, Jr., Thomas Kennedy, and others for, among other things, violations of: (A) Title 18, United States Code, Section 1341 (mail fraud); (B) Title 18, United States Code, Section 1343 (wire fraud); (C) Title 18, United States Code, Section 1951 (interference with commerce by extortion); (D) Title 18, United States Code, Section 1962 (racketeering); (E) Title 18, United States Code, Section 1956 (money laundering); (F) Title 26, United States Code, Section 7206(1) (subscribing to false tax returns); (G) Title 18, United States Code, Section 1512 (obstruction of justice); (H) Title 31, United States Code, Section 5324 (structuring currency transactions); (I)

-1-

Title 21, United States Code, Section 841 (narcotics trafficking); and (J) conspiracy to commit these offenses, some in violation of Title 18, United States Code, Section 371[1] (hereinafter, the "specified federal offenses").

3.   The subject locations (hereinafter, the "subject locations") sought to be searched are as follows:

(A)   The Boston Society of the New Jerusalem Church is located at 140 Bowdoin Street, Boston, Massachusetts (hereinafter, the "CHURCH"). The CHURCH and the Bostonview Apartments are located within the same building, which is a single building, with the address, 130-140 Bowdoin Street on Beacon Hill in Boston, almost directly across from the staff entrance to the Massachusetts State House. The building stands 18 stories and has a brick façade. At the street level, four decorative concrete pillars extend up the front center of the building and support an off-white, wooden A-frame sign which reads, "Swedenborgian" and below it, "Church On The Hill." Under the A-frame sign, between the two middle pillars is a set of double wooden door under an arched window and a sign that reads "BOSTON SOCIETY OF THE NEW JERUSALEM." To each side of the wooden doors, set between the outer pillars, is a single rectangular window set below an arched window. There is a flower box located beneath each of these two windows. To the left and below the A-frame sign is an off-white wooden portico that is set above a single door and an arched window. Markings on the front of this portico identify the address as "130" and below it, "Bowdoin Street." This doorway is further identified with the words, "BOSTONVIEW APARTMENTS." Immediately to the left of the entrance to 130 Bowdoin Street is the driveway leading into the building's parking garage. To the right and below the A-frame sign is an off-white wooden portico that is set above a single door and an arched window. Markings on the front of this portico identify the address as "140" and below it, "Bowdoin Street." This doorway is further identified with the words, "NEW JERUSALEM CHURCH ENTRANCE." Photographs of the CHURCH are attached hereto as **Exhibit A**.

(B)   The Bostonview management office suite of the Bostonview Apartments is located at 130 Bowdoin Street, Unit 1804, Boston, Massachusetts (hereinafter, the "BOSTONVIEW OFFICE"). The BOSTONVIEW OFFICE is located on the

---

[1]   Some of the statutes detailed above contain their own conspiracy provisions, such as Title 18, United States Code, Sections 1349, 1956, and 1962.

18th floor, unit 1804, of 130 Bowdoin Street, within the Bostonview Apartments. Upon exiting the elevator on the 18th floor, the office is to the right, the last apartment on the left at the end of the hall. The entrance to the management office is located to the left of the doorway to the roof deck (which is straight ahead at the end of the hall). The BOSTONVIEW OFFICE door has a sign which identifies it as the management/rental office. The BOSTONVIEW OFFICE occupies a two-room apartment that also has a galley kitchen and a bathroom. There is one office located in the room upon entering as well as a second office in the room behind it.

(C)     The personal residence of EDWARD J. MACKENZIE is located at 955 Pleasant Street, Unit 1,[1] East Weymouth, Massachusetts 02189 (hereinafter, the "MACKENZIE RESIDENCE"). The MACKENZIE RESIDENCE is part of a row of townhouses identified as "Farrah Gardens" by a sign located at the beginning of the single driveway into the complex. Fifteen individual units are connected by one or two common walls (the two end units each have one common wall while the other units each have two common walls) to create a rectangular footprint for the entire structure. Each of the units are virtually identical in design and color with white clapboard facades, red front doors (each with an oval window), and red shutters on each of two second floor windows. Each unit appears to have two full stories as well as a third-story dormer window. Access to each unit can be gained via the front door, which faces the complex's driveway. Designated parking spaces for each unit are located on the opposite side of the driveway. Unit 1 is located on the left end of the complex as you face it from the front. The front door is on the right side of the unit at the top of a small set of concrete stairs which are flanked by wrought-iron banisters. To the left of the front door is a two-window bay window with a black-painted metallic number "1" on the outside window frame. To the right of the front door is a small single window. The second story has two individual shuttered windows above and to the left of the front door and one single window above and to the right of the front door. The third story has a single, dormered window. Photographs of the MACKENZIE RESIDENCE are attached as **Exhibit B.**

---

[1]     A search of publicly filed records shows that MACKENZIE refers to the MACKENZIE RESIDENCE as 953 Pleasant Street, Unit 1, East Weymouth, MA and as 955 Pleasant Street, Unit 1, East Weymouth, MA interchangeably, even though both addresses are one and the same property, and are identified under the same block, lot, and parcel number that is recorded by the Weymouth Registry of Deeds. Indeed, a LexisNexis search showed an address listing for MACKENZIE as "953-955 Pleasant St Unit 1, East Weymouth, MA." Therefore, the MACKENZIE RESIDENCE, which is depicted in Exhibit B, shall include references to 953 Pleasant Street, Unit 1, East Weymouth, MA and as 955 Pleasant Street, Unit 1, East Weymouth, MA.

4. I am familiar with the information contained in this Affidavit through: (A) review of documents and records received from third parties, including local government, bank, property, and financial records; (B) information provided by cooperating witnesses; (C) witness interviews; and (D) briefings with other agents and law enforcement officers. Since this Affidavit is submitted for the limited purpose of securing authorization to search the subject locations, I have not included each and every fact known concerning this investigation. Where I refer to statements of others, those statements have been related in substance and in part.

### OVERVIEW OF AFFIDAVIT

5. The first section of this Affidavit provides background information concerning certain subjects and other individuals and entities material to this ongoing grand jury investigation. The second section of this Affidavit sets forth a detailed summary of certain of the illegal schemes uncovered during the investigation and the relation of the subject locations to those schemes. The final section of this Affidavit describes the evidence, fruits and instrumentalities that there is probable cause to believe are located at the subject locations and sets forth a request: (A) for permission to search the subject locations after 6:00 a.m. and before 10:00 p.m.; and (B) that this application and related documents remain sealed, except for copies of the search warrants and inventory notices necessary for execution at the subject locations, until further order of this Court due to the continuing nature of this ongoing grand jury investigation.

### I.    SUBJECTS AND OTHER INDIVIDUALS AND ENTITIES

6. The Boston Society of the New Jerusalem, Incorporated (hereinafter, "BSNJ" or the "Church") is a charitable religious non-profit corporation, which operates as a church, and was established under the laws of the Commonwealth of Massachusetts. The Church classifies itself as a Swedenborgian Church, which follows the theological writings of Emanuel Swedenborg,

-4-

and traces its roots back to 1818. According to its website,[2] the Church currently has six

"Church Officers:" (a) President; (b) President Emeritus; (c) Vice President; (d) Secretary; (e)

Director of Operations; and (f) Interim C.F.O. The Church also has eight Trustees, including a

Chairman, President, President Emeritus, Treasurer, and four at-large members. The "Church

Staff" also includes an Office Administrator, a Director of Operations, a C.F.O., a Treasurer, an

Administrative Assistant, and a Sexton. Three of the Church Staff positions are duplicative of

Church officer positions of the same title.

   7. The Church established Bostonview Corporation, Inc. (hereinafter, "BVC") for the

specific purpose of holding title to the Bostonview Apartments, a property located at 130-140

Bowdoin Street, Boston, Massachusetts (hereinafter, the "BOSTONVIEW APARTMENTS").

The BOSTONVIEW APARTMENTS consist of an 18-story apartment building with

approximately 145 residential rental units. These rental units generate net income to the Church

of approximately $1.4 million per year. Each year since in or about 2006, BVC has remitted all

of its net income to the Church. Prior to in or about 2006, BVC maintained its income in

interest-bearing accounts that were controlled and managed by a real estate management

company called Winn Management (hereinafter, "WINN MANAGEMENT"), which then passed

a portion of BVC rental income profits to the Church.

   8. EDWARD J. MACKENZIE, JR., 55, is a self-professed and federally convicted

former criminal, who has admitted responsibility for committing various crimes throughout his

life within Massachusetts, which included burglary, robbery, armed assault, sexual assault, and

narcotics trafficking.[3] In 1993, MACKENZIE pled guilty in Boston Federal District Court to

---

[2]    See www.churchonthehillboston.org.

[3]    MACKENZIE recounts most of his criminal resume and violent criminal exploits in "Street Soldier: My
Life as an Enforcer for Whitey Bulger and the Boston Irish Mob," a 2003 autobiography of MACKENZIE, which
MACKENZIE co-authored with two other authors.

conspiracy to distribute cocaine. In or about 2002, MACKENZIE joined the Church, and thereafter obtained various positions within the Church, including Treasurer, Trustee, and Director of Operations (the last position was newly created for MACKENZIE after MACKENZIE joined the Church). MACKENZIE also held official positions within BVC, including BVC Director.

9. MACKENZIE was a former Church Trustee and has been the Director of Operations for the Church since in or about December 2003. MACKENZIE receives yearly compensation from the Church, which currently includes approximately $120,000 in salary, use of a Church credit card, approximately $3,000 per month to purportedly provide Church catering services, and other bonuses. MACKENZIE, his relatives, and his associates also have received various benefits paid for by the Church, including: purchased motor vehicles, leased motor vehicles, education tuition payments, loans, home improvement expenses, mortgage forgiveness payments, and other miscellaneous payments.

10. MACKENZIE is the principal of two companies: (a) Fillabuster Catering Trust (d/b/a Fillabusta Food Service), a shell company that MACKENZIE used, among other purposes, to receive commercial kickback payments (hereinafter, "FILLABUSTER"), and (b) Courmac Realty Trust, a shell company that purported to provide real estate investment and other services (hereinafter, "COURMAC").

11. MACKENZIE concealed his controlling interests in FILLABUSTER and COURMAC by causing FILLABUSTER to be established in the name of Krystal Donnelly (an ex-girlfriend of MACKENZIE's, hereinafter "DONNELLY"), and by causing COURMAC to be established in the name of Courtney MacKenzie (MACKENZIE's daughter). In reality, however, MACKENZIE controlled and used FILLABUSTER and COURMAC to, among other

-6-

things, conceal MACKENZIE's receipt of: (i) stolen Church and BVC funds; (ii) illegal

kickbacks on Church-related and BVC-related transactions; and (iii) other corrupt proceeds, as

described below in Section II of this affidavit.

12. A cooperating witness, THOMAS J. KENNEDY, was a former Massachusetts Bay

Transportation Authority employee and private business owner, and was a member of the Church

from in or about 2002 to in or about 2008. From in or about 2002 to in or about 2008,

KENNEDY held various positions at the Church and BVC, including Church Trustee, BVC

President, and BVC Director. KENNEDY was an associate of MACKENZIE and had

introduced MACKENZIE to the Church.

13. JOHN BURKE was an associate of MACKENZIE's and became a Church member

through MACKENZIE. BURKE also was the Church Treasurer from in or about 2003 to in or

about March 2006. BURKE and MACKENZIE, created and controlled an entity called

Harborview Real Estate Corporation (hereinafter, "HARBORVIEW"), which was funded by

Church funds, and which purported to be a real estate investment company. In fact,

HARBORVIEW was used to funnel Church money to MACKENZIE, BURKE, and their

associates.

14. Another cooperating witness, MARTIN RAFFOL, was an associate of

MACKENZIE's, and a former executive at WINN MANAGEMENT, the company that managed

the BOSTONVIEW APARTMENTS, the Church's residential rental property, from as least as

early as the mid-1990s until the Fall of 2010.

## II.   PROBABLE CAUSE PERTAINING TO THE SPECIFIED FEDERAL OFFENSES

15. The investigation has revealed that MACKENZIE, KENNEDY, and other individuals conspired to obtain authority and influence within the Church in order to cause the Church to operate as a corrupt enterprise. Once MACKENZIE and KENNEDY obtained the necessary authority and influence within the Church, they used the Church to fraudulently enrich themselves through: (i) embezzling Church funds that were derived from the Church's rental income on the BOSTONVIEW APARTMENTS; (ii) stealing third party payments that were due and owing to the Church and BVC; (iii) collecting kickbacks from vendors that provided goods and services to the Church; and (iv) overbilling and collecting fees for catering services to the Church, among other means.

16. From in or about 2004 through in or about 2012, MACKENZIE received over approximately $700,000[4] in corrupt cash and third party payments through the schemes listed in the above paragraph. A review of MACKENZIE's U.S. Federal Income Tax Returns, Form 1040, for the years 2007 through 2011 revealed that MACKENZIE falsely reported his income for such years by failing to report MACKENZIE's income from the above-described schemes.

17. The investigation also has revealed that MACKENZIE is involved in the sale and distribution of controlled substances, namely, oxycodone; and that MACKENZIE has used the CHURCH and the MACKENZIE RESIDENCE as locations to store oxycodone for the purposes of his distribution.

### Background – MACKENZIE and MACKENZIE's Co-conspirators Transform the Church into a Corrupt Enterprise

18. The Church's organizational structure was based upon Church membership representation. In other words, Church members voted to elect the Church Trustees and other

---

[4]       This figure does not include other Church funded benefits to MACKENZIE, which included leased and purchased motor vehicles, tuition grants, and unpaid and forgiven loans, among other things.

Church executives, and the Trustees and executives then assumed authority and control over Church matters, which included the Church's and BVC's finances. According to KENNEDY and others, beginning in or about 2002, MACKENZIE and KENNEDY plotted to gain control of the Church by recruiting their family members and other associates to become voting Church members.

19. Through filling the Church membership ranks with their supporters, MACKENZIE and KENNEDY soon assumed positions of authority within the Church, which enabled MACKENZIE and KENNEDY to exercise control over the Church's finances and other matters.[5] By 2003, MACKENZIE was a Church Trustee and the Treasurer for the Church and BVC, KENNEDY was the Church Trustee Chairman and the President of BVC, and MACKENZIE-associate BURKE was a Director of BVC. According to KENNEDY, however, it was not until MACKENZIE caused amendments to the Church's By-Laws that MACKENZIE effectively cemented his grip over the Church.

20. In or about November 2003, approximately one month before the Church appointed MACKENZIE as the Church's first and (to date) only Director of Operations, MACKENZIE used his influence within the Church to cause the Church to amend its By-Laws. The amendment to the Church's By-Laws caused four significant changes to the Church's governance rules, all of which increased MACKENZIE's authority within the Church, and inured to MACKENZIE's benefit, as follows:

    a.    The Church declared its independence from all other religious organizations, including its former parent, the General Convention of the New Jerusalem in the United States of America, a Swedenborgian institution (the "General Convention"),

---

[5]    To further their scheme to control the Church, MACKENZIE and KENNEDY sought to curry favor with the Church's then-reverend, Reverend Steven ELLIS (aka Glenn S. Ellis) and ELLIS's brother, Rex Ellis, through various means, which included supporting initiatives to: (i) increase ELLIS's salary; (ii) forgive loans and extend additional loans to ELLIS; (iii) pay for motor vehicle expenses for ELLIS and Rex Ellis; and (iv) direct Church contractors to hire Rex Ellis.

which had formerly exercised oversight authority over Church governance and other Church matters;

b.   Church membership could be attained through a majority vote, instead of a two-thirds vote; and former Church members would lose their voting rights after only two years of inactivity as opposed to three years;

c.   The Church Treasurer was no longer subject to the "direction and control" of Church Trustees and could disburse Church monies and make investments without Church Trustee voting approval; and

d.   (i) BVC property could be transferred and sold without the requirement of a two-thirds Church membership vote; (ii) there was no restriction on BVC profits inuring to private stockholders or individuals; and (iii) **any changes to the physical plant of the BOSTONVIEW APARTMENTS was to be "directed by a Director of Operations"** (emphasis added).

21. The amendment to the Church's By-Laws effectively: (i) wrested oversight over Church governance matters from the General Convention, the parent organization; (ii) permitted MACKENZIE to purge the Church membership rolls and replace them with his associates; and (iii) placed the Church's financial reins into the hands of one individual – a Treasurer, whom was handpicked by MACKENZIE (e.g., BURKE from 2003 to 2006, and DOUG HANSON, another MACKENZIE associate, from 2006 to 2009).

22. Moreover, combined with the reduced financial oversight, MACKENZIE, as the Director of Operations, now had the official authority to direct changes to the physical plant of Church property and the BOSTONVIEW APARTMENTS, which included the appointment of commercial contractors and other vendors. In essence, through the amended By-Laws, MACKENZIE had opened the Church for business – namely, the business of furthering MACKENZIE's various corrupt schemes. These schemes are detailed below by Section: (i) Section A describes MACKENZIE's Church embezzlement schemes; (ii) Section B describes MACKENZIE's Church check theft scheme; and (iii) Section C describes MACKENZIE's multiple Church commercial kickback schemes.

## A. The Church Embezzlement Schemes

23. In 2003, while MACKENZIE was the Church Treasurer, Church bank accounts were used to purchase and/or fund the following:

    a. a 2004 Jeep Grand Cherokee that was purchased for $33,581.40 for KENNEDY (Church bank check signed by MACKENZIE);

    b. a 2000 Jeep Grand Cherokee that was purchased for $18,390 for MACKENZIE's brother, RONALD MACKENZIE (Church bank check signed by MACKENZIE);

    c. a 2004 Chrysler Pacifica Wagon that was purchased for $34,875 for MACKENZIE's ex-wife, CAROLYN MACKENZIE (Official bank check drawn upon a Church account);

    d. a $50,000 official bank check issued to MACKENZIE's personal attorney (Al Nugent) to pay for private legal fees owed by MACKENZIE (Official bank check drawn upon a Church account);

    e. a $5,000 check from HARBORVIEW (which was funded by the Church) that was payable to MACKENZIE; and

    f. a $5,000 check from HARBORVIEW that was payable to MACKENZIE's daughter, COURTNEY MACKENZIE.

24. As noted above, by the end of 2003, MACKENZIE stepped down from the unsalaried position of Church Treasurer and assumed the newly created position of Church Director of Operations, with a starting salary of $100,000 per year.[6] MACKENZIE's associate, BURKE, was appointed to replace MACKENZIE as Treasurer. But even though MACKENZIE no longer exercised official control over Church funds as Treasurer, according to KENNEDY, MACKENZIE's access and influence over Church money (through handpicked associates, including BURKE) were extensive and significant.

---

[6]    As the Director of Operations, MACKENZIE became authorized to "be responsible for the overall duties of the [Church,]" according to MACKENZIE's employment contract with the Church.

**The Church Investment Scheme**

25.  In or about 2004, MACKENZIE and KENNEDY conspired to defraud the Church

through a stock investment scheme in which MACKENZIE and KENNEDY used their influence

and authority within the Church to cause the Church to invest approximately $200,000 from its

Massachusetts bank account into a Florida company called Space Propulsion Systems, Inc.

("SPACE PROPULSION").[7] And, as per the conspiracy, and unbeknownst to the other Church

Trustees, SPACE PROPULSION principals then kicked back $40,000 each to MACKENZIE

and KENNEDY.  MACKENZIE received and funneled his kickback, as follows:

| Date (transaction) | Payor | Payee | Amount |
|---|---|---|---|
| 6/4/2004 (wire) | BVC (CHURCH subsidiary) | SPACE PROPULSION | $200,000 |
| 6/7/2004 (wire) | SPACE PROPULSION | KENNEDY | $40,000 |
| 6/8/2004 (wire) | SPACE PROPULSION | COURMAC | $40,000 |
| 6/9/2004 (check) | COURMAC | MACKENZIE's personal attorney | $10,000 |

**The Church Tuition-Grant Scheme**

26.  MACKENZIE and KENNEDY also used their authority and influence in the Church

to profit from the Church's tuition-grant program.  As part of the Church's charitable activities,

the Church used the rental profits from the BOSTONVIEW APARTMENTS to offer academic

tuition grants to Church members.  The program was open to Church members and their family

members, who were then required to submit an application for approval by the Church Trustees.

---

[7]       KENNEDY informed the FBI that the Church received approximately 400,000 shares of stock in SPACE
PROPULSION (which also did business under the name of M E I Corporation, according to public records).
According to OTCMarkets.com, a website that tracks the stocks of certain small market companies, as of April 24,
2013, the total approximate market value of the Church's SPACE PROPULSION stock is currently $4,000.
(SPACE PROPULSION's share price, with 31,686,679 shares outstanding and an estimated market value of
$316,867, results in a value of approximately 1 cent per share, or par value.)

27. In practice, however, MACKENZIE and KENNEDY used the Church tuition-grant program as a vehicle to enrich themselves, and as a tool to gain influence over other Church members and others. Through the period from in or about 2004 to in or about 2011, MACKENZIE and KENNEDY used their influence to obtain over approximately $800,000 in Church tuition grants for their respective family members and associates. The Church continues to spend approximately $125,000 annually in tuition grants to Church members and their respective relatives and/or associates.

28. From in or about 2006 to in or about 2008, MACKENZIE also used the Church's tuition-grant program to defraud the Church by funding a cash kickback scheme. At that time, MARTIN RAFFOL, an executive at WINN MANAGEMENT (the management company for the BOSTONVIEW APARTMENTS) had two children that were attending college. Neither RAFFOL nor his children (Mathew and Lindsey) were members of the Church, which was a pre-requisite for applicants for the Church tuition-grant program.

29. MACKENZIE, however, used his influence and authority within the Church to assist RAFFOL in obtaining Church tuition grants for RAFFOL's children that totaled approximately $108,980 during the period from 2006 to 2008. In or about January 2006, after the Church had issued a $15,000 tuition grant to RAFFOL's son, MACKENZIE met with RAFFOL at a Dunkin Donuts store near the Church. According to RAFFOL, at this meeting, MACKENZIE stated that because MACKENZIE was "short" (meaning that MACKENZIE needed money) and since RAFFOL was "a little bit ahead" (meaning that RAFFOL had received the Church tuition grant), RAFFOL needed to "help" MACKENZIE (meaning that RAFFOL had to pay MACKENZIE for his assistance at the Church).

30. According to RAFFOL, shortly after the January 2006 meeting with RAFFOL, MACKENZIE met with RAFFOL in front of the Church and MACKENZIE accepted an envelope containing approximately $2,000 to $3,000 in cash from RAFFOL. Following this first cash kickback payment, MACKENZIE would contact RAFFOL each time the Church had either approved or paid a tuition grant for one of RAFFOL's children, and would ask RAFFOL for "help," meaning a cash payment. RAFFOL would then meet with MACKENZIE and pay MACKENZIE cash in return for MACKENZIE's assistance with the Church tuition grants, as detailed below, on the following approximate dates:

| Date | Mailed Tuition Grant | Cash Kickback |
|---|---|---|
| 1/1/2006 | Church mails $15,000 tuition check to Boston College payable for RAFFOL's son | RAFFOL pays $2,000-$3,000 cash to MACKENZIE in front of the Church shortly after |
| 8/3/2006 | Church mails $15,000 tuition check to Boston College payable for RAFFOL's son | RAFFOL pays $2,000-$3,000 cash to MACKENZIE shortly after |
| 1/4/2007 | Church mails $15,000 tuition check to Boston College payable for RAFFOL's son | RAFFOL pays $2,000-$3,000 cash to MACKENZIE shortly after |
| 6/14/2007 | Church mails $15,000 tuition check to Boston College payable for RAFFOL's son | RAFFOL pays $2,000-$3,000 cash to MACKENZIE shortly after |
| 1/4/2008 | Church mails $15,000 tuition check to Boston College payable for RAFFOL's son | RAFFOL pays $2,000-$3,000 cash to MACKENZIE shortly after |
| 7/10/2008 | Church mails $15,000 tuition check to Quinnipiac University for RAFFOL's daughter | RAFFOL pays $2,000-$3,000 cash to MACKENZIE shortly after |
| 8/14/2008 | Church mails $18,980 tuition check to Boston College payable for RAFFOL's son | RAFFOL pays $2,000-$3,000 cash to MACKENZIE shortly after |
| **TOTALS** | **Church Tuition Grants to RAFFOL - $108,980** | **MACKENZIE Kickbacks - $14,000 to $21,000** |

### The Fillabuster Catering Scheme

31. The Church's charitable activities also included providing free meals once a week to Church members and other Church service attendees. As the Director of Operations,

-14-

MACKENZIE used his influence and authority to assume control over the catering activities of the Church's weekly meal services. Through this influence, MACKENZIE devised a scheme whereby MACKENZIE caused the Church to pay a company that was secretly controlled by MACKENZIE for such food services.

32. Next door to the Church at 142 Bowdoin Street was a restaurant called Fill-A-Buster Restaurant, which had been doing business next to the Church for over twenty years. In or about May 2006, MACKENZIE caused the creation of an entity called "Fillabuster Catering Trust" (FILLABUSTER) in the name of MACKENZIE's ex-girlfriend, KRYSTAL DONNELLY, and obtained an employer identification number ("EIN")[8] for FILLABUSTER. In or about June 2006, MACKENZIE opened a bank account in FILLABUSTER's name and EIN, but with MACKENZIE as the sole signatory authority on the account, and with MACKENZIE's associate, TINA BURM's[9] address in Braintree as the account mailing address. According to DONNELLY, DONNELLY had no affiliation with Fill-A-Buster Restaurant at 142 Bowdoin Street, and DONNELLY was completely unaware of the existence of FILLABUSTER.

33. Following the creation of the sham FILLABUSTER, MACKENZIE caused the Church to pay MACKENZIE, through FILLABUSTER, hundreds of thousands of dollars for minimal catering services. MACKENZIE, however, never disclosed to the Church his interest or relationship with FILLABUSTER. In addition, the Church never issued an IRS Form 1099-MISC[10] to FILLABUSTER, which would have notified the IRS of FILLABUSTER's income derived from the Church. Through these devices, MACKENZIE was able to conceal from the

---

[8] Generally, the IRS requires corporations or other entities that have employees to have an EIN for tax withholding purposes on such employees.

[9] MACKENZIE introduced BURM to the Church, and BURM became the Church Secretary. In the Church check theft scheme (see Section II.B., infra) MACKENZIE used another bank account in TINA BURM's name to funnel stolen Church proceeds.

[10] According to publically available IRS instructions for the IRS Form 1099-Misc: "Payments for which a Form 1099-MISC is not required include[:] . . . [g]enerally, payments to a corporation . . . [and] tax-exempt trusts . . . ." FILLABUSTER had an EIN, which signified that it was either a corporation or an entity with employees.

Church and the IRS, thousands of dollars of proceeds to MACKENZIE, via FILLABUSTER,[11]
as detailed in the approximate figures below:

| Year | Church Payments to FILLABUSTER |
|------|-------------------------------|
| 2006 | $37,000 |
| 2007 | $51,235 |
| 2008 | $17,850 |
| 2009 | $37,392.50 |
| 2010 | $42,450 |
| 2011 | $50,675 |
| 2012 | $80,373[12] |
| **Total** | **$316,975.50** |

### The Church Grandfather Clock

34. In or about 2006 or 2007, MICHAEL TRAVERS, a contractor that was hired by the
Church to do wall removal and repair (see The Pipe Replacement, Boiler Replacement, and
Booster Pump Kickback Schemes, Section II.C., infra) noticed an old grandfather clock (the
"Clock") inside the Church. TRAVERS told MACKENZIE that TRAVERS thought that
TRAVERS's brother-in-law, ROBERT HYNES, who repaired and sold grandfather clocks,
would be interested in purchasing the Clock. MACKENZIE agreed to meet with HYNES.

35. In an April 13, 2011 interview with the FBI, HYNES stated that in or about 2006 or
2007, HYNES called MACKENZIE to set up an appointment to see the Clock. At this meeting
with MACKENZIE at the Church, HYNES brought $1,500 in cash to purchase the Clock.
HYNES then stated that MACKENZIE offered the Clock for sale, MACKENZIE took the
$1,500 in cash from HYNES, and MACKENZIE helped HYNES load the clock into HYNES's
truck. According to HYNES, the entire transaction took about ten minutes. According to the

---

[11]     As detailed in Sections II.B. and II.C., MACKENZIE also used FILLABUSTER as a conduit for his check-
theft and commercial kickback schemes involving the Church.
[12]     The 2012 total includes approximately $19,405 in payments from BVC to FILLABUSTER.

Church's By-Laws, MACKENZIE did not have unilateral authority to sell the Church's property, such as the Clock.

### B.     The Church Check Theft Scheme

36.  During the same period that MACKENZIE was collecting Church payments to FILLABUSTER and cash kickbacks from RAFFOL on Church tuition grants, MACKENZIE and KENNEDY conspired to steal checks that were payable to the Church and/or BVC from third parties.  To further this scheme, in April 2006, KENNEDY created two sham bank accounts – one in the name of the Church, "Boston Society of the New Jerusalem, Inc.," with a Post Office Box address in Boston at P.O. Box 961071 (the "Sham Church Account") and one in the name of BVC, "BVC Trust," (the "Sham BVC Account") – at Sovereign Bank.

37.  In order to conceal and perpetuate the check theft scheme against the Church, KENNEDY also maintained signatory authority over the sham Church and BVC bank accounts and opened each sham account using addresses that were under KENNEDY's control.  By causing the Sham Church and Sham BVC Account statements to be mailed to KENNEDY, MACKENZIE and KENNEDY prevented the actual Church and BVC from detecting their scheme to divert Church and BVC checks.

38.  The stolen checks obtained by MACKENZIE included:

a.     MZA Trust ("MZA") payments to BVC, which represented MZA payments to BVC for the long-term rental of parking spaces at the BOSTONVIEW APARTMENTS;

b.     AXA Equitable Life Insurance Company ("AXA") annuity payments to the Church; and

c.     payments to BVC by each of MICHAEL PERRY and PETER O'CONNELL, who were investors that were fraudulently led to believe (by MACKENZIE and KENNEDY) that such payments granted PERRY and O'CONNELL priority rights to purchase the BOSTONVIEW APARTMENTS, when no such rights existed.

39.   According to KENNEDY, once the stolen checks were deposited into the Sham Church and Sham BVC accounts, MACKENZIE and KENNEDY would then split the proceeds, and, at MACKENZIE's direction, KENNEDY would funnel MACKENZIE's approximately 50% share through other shell companies and third party payments, among other means, on the approximate dates, as follows:

| Date | Stolen Check (Deposited into either Sham Church or Sham BVC Accounts) | Proceed Distribution via Sham Church and BVC TRUST Sovereign Bank Accounts |
|---|---|---|
| 4/26/2006 | MZA check payable to BVC for $34,000 | |
| 4/27/2006 | AXA check payable to the Church for $53,565.46 | |
| 5/1/2006 | | Sham BVC Account check for $11,224 payable to cash ($2,100 in cash to MACKENZIE; $9,124 official check to MACKENZIE's private attorneys (Looney & Grossman)) |
| 5/2/2006 | AXA check payable to the Church for $604.28 | Sham BVC Account check for $6,550 deposited in account of MACKENZIE associate, TINA BURM |
| 5/5/2006 | | Sham Church Account check to cash used to purchase Official Check for $25,000 payable to COURMAC (MACKENZIE shell entity) |
| 9/1/2006 | MZA check payable to BVC for $30,000 | |
| 9/7/2006 | | $16,500 cash withdrawal from Sham BVC Account, of which $13,500 used to purchase Official Check payable to FILLABUSTER (MACKENZIE shell company) |
| 4/8/2008 | PERRY check payable to BVC for $10,000 | |
| 4/14/2008 | | Sham BVC Account purchases $5,000 Official Check payable to FILLABUSTER |
| 5/20/2008 | O'CONNELL check payable to BVC for $20,000 | |
| 5/22/2008 | | Sham BVC Account checks: (i) $7,000 payable to FILLABUSTER; (ii) $3,000 payable to MACKENZIE |
| 6/20/2008 | O'CONNELL check payable to BVC for $20,000 | |
| 6/24/2008 | | Sham BVC Account checks: (i) $7,000 payable to FILLABUSTER; (ii) $3,000 payable to MACKENZIE's son, JUAN FIGUEROA |

-18-

| Date | Stolen Check (Deposited into either Sham Church or Sham BVC Accounts) | Proceed Distribution via Sham Church and BVC TRUST Sovereign Bank Accounts |
|---|---|---|
| Totals | **$168,169.74** in stolen checks | **$81,274** distributed to MACKENZIE and for MACKENZIE's benefit |

### C.    The Church Commercial Kickback Schemes

40.  As noted above, once the Church's By-Laws were amended, MACKENZIE assumed

official authority with respect to any "changes to the physical plant of the BOSTONVIEW

APARTMENTS." With MACKENZIE in charge, those "changes" manifested themselves in

well over one million dollars in renovation and improvement costs to the BOSTONVIEW

APARTMENTS, as well as the Church, during the period from in or about 2006 to in or about

2012. It was at this time, that MACKENZIE effectively operated the Church as a business – a

business that reaped MACKENZIE hundreds of thousands of dollars in corrupt cash and other

kickbacks on such renovations, as follows:

### The Carpet Kickback Scheme

41.  In or about 2006, STEVEN BOURGOIN ("CARPET VENDOR"), an owner of a

small carpet flooring company called Low Overhead Discount Carpet, was introduced to

MACKENZIE by MARK PALLUCCIO, an associate of MACKENZIE's. According to the

CARPET VENDOR, PALLUCCIO informed the CARPET VENDOR that MACKENZIE could

assist the CARPET VENDOR in obtaining carpeting work at the Church, but that the CARPET

VENDOR would have to pay  kickbacks to MACKENZIE in exchange for MACKENZIE's

assistance. The CARPET VENDOR agreed to this arrangement.

42.  Thereafter, from in or about September 2006 to in or about December 2011,

MACKENZIE used his influence and authority at the Church to assist the CARPET VENDOR in

obtaining approximately 44 carpet jobs at the Church and the BOSTONVIEW APARTMENTS

in return for cash kickbacks from the CARPET VENDOR. According to the CARPET

VENDOR, the kickback arrangement with MACKENZIE typically occurred as follows:

    a.    MACKENZIE would direct the CARPET VENDOR to submit an inflated quote for a carpeting job to be performed either at the Church or BVC. For example, on one occasion in 2006, the CARPET VENDOR provided MACKENZIE an oral estimate of $18,000 for a carpet replacement job, and in response to the quote, MACKENZIE stated, "Oh, you mean $28,000?" Through this and similarly coded communication, MACKENZIE communicated to the CARPET VENDOR that MACKENZIE expected the CARPET VENDOR to pay MACKENZIE a kickback in the amount of approximately 25% to 33%[13] of the total quote in order to receive the Church's carpeting business.

    b.    After the CARPET VENDOR was awarded the work and received an initial deposit payment from the Church or BVC, MACKENZIE would call the CARPET VENDOR and ask "Where's my paper work?" - which the CARPET VENDOR understood to be MACKENZIE's kickback demand. The CARPET VENDOR would then respond to MACKENZIE that the CARPET VENDOR would get MACKENZIE his "paperwork tomorrow," meaning that the CARPET VENDOR would deliver the cash kickback to MACKENZIE the next day. The following day, the CARPET VENDOR would deliver the cash kickback (in part or in full) by handing MACKENZIE an envelope containing cash either inside the Church or at the CARPET VENDOR's store in Quincy. On some occasions, the CARPET VENDOR would hand MACKENZIE's cash kickback to an intermediary, who was PALLUCCIO's sister, TINA BURM, another MACKENZIE associate.

    c.    In certain instances, MACKENZIE assisted the CARPET VENDOR in obtaining carpet replacement work at the Church that the CARPET VENDOR believed was unnecessary. In at least two instances, MACKENZIE assisted the CARPET VENDOR in receiving Church payments for carpeting work that was never performed at the Church. In almost every instance, the CARPET VENDOR paid a cash kickback to MACKENZIE on the money that the CARPET VENDOR received from the Church or BVC.

    43.  According to the CARPET VENDOR, and after a review of the CARPET

VENDOR's business and bank records, at or about the following dates, the CARPET VENDOR

paid MACKENZIE the following cash kickbacks after being awarded (without any competitive

bidding process) the following Church and BVC carpeting jobs (amounts approximate):

---

[13]    According to the CARPET VENDOR, because the managing company reviewed the costs of carpeting work at the BOSTONVIEW APARTMENTS, MACKENZIE and the CARPET VENDOR agreed that the cash kick back on BVC carpeting jobs would only be approximately $150-$300 per apartment.

| Job Number | Date | Location | Church/BVC Check Payments to CARPET VENDOR | Cash Kickbacks Paid to MACKENZIE |
|---|---|---|---|---|
| 1 | 9/5/2006 | Church | $28,974 | $10,000 |
| 2 | 9/25/2006 | Church | $5,759 | $2,000 |
| 3 | 10/17/2006 | Church | $1,595 | $600 |
| 4 | 10/30/2006 | Church | $16,905 | $5,000 |
| 5 | 11/25/2006 | Church | $7,984 | $2,500 |
| 6 | 3/31/2007 | Church | $17,585 | $6,000 |
| 7 | 4/19/2007 | Church | $23,660 | $8,000 |
| 8 | 5/23/2007 | BVC | $40,000 | $10,000 |
| 9 | 7/10/2007 | Church | $6,292 | $2,000 |
| 10 | 11/7/2007 | Church | $1,595 | $600 |
| 11 | 11/7/2007 | Church | $1,536 | $600 |
| 12 | 2/19/2008 | Church | $5,629 | $2,000 |
| 13 | 3/12/2008 | BVC | $24,761 | $8,000 |
| 14 | 4/3/2008 | Church | $23,193 | $7,000 |
| 15 | 2/10/2009 | Church | $23,659 | $8,000 |
| 16 | 8/4/2009 | Church | $7,770 | $2,500 |
| 17 | 11/22/2010 | Church | $2,644 | $800 |
| 18 | 11/30/2010 | Church | $19,559 | $7,000 |
| 19 | 2/2/2011 | BVC | $775 | $150 |
| 20 | 2/15/2011 | BVC | $1,152 | $150 |
| 21 | 2/15/2011 | BVC | $1,659 | $150 |
| 22 | 2/17/2011 | BVC | $955 | $150 |
| 23 | 3/7/2011 | BVC | $1,659 | $150 |
| 24 | 3/7/2011 | BVC | $1,152 | $150 |
| 25 | 3/8/2011 | BVC | $1,324 | $150 |
| 26 | 3/28/2011 | Church | $11,892 | $5,000 |
| 27 | 4/12/2011 | BVC | $2,042 | $300 |
| 28 | 4/26/2011 | BVC | $2,042 | $150 |
| 29 | 4/26/2011 | BVC | $872 | $150 |
| 30 | 5/3/2011 | BVC | $2,042 | $300 |
| 31 | 6/2/2011 | BVC | $2,042 | $150 |
| 32 | 6/2/2011 | BVC | $872 | $150 |
| 33 | 6/28/2011 | BVC | $6,647 | $2,500 |
| 34 | 7/8/2011 | BVC | $2,042 | $150 |
| 35 | 7/8/2011 | BVC | $872 | $150 |
| 36 | 7/11/2011 | BVC | $872 | $150 |
| 37 | 7/11/2011 | BVC | $2,042 | $150 |
| 38 | 7/20/2011 | BVC | $2,326 | $300 |
| 39 | 8/27/2011 | Church | $392 | $100 |
| 40 | 9/28/2011 | Church | $14,585 | $5,000 |
| 41 | 10/4/2011 | No work | $11,814 | $5,900 |

| Job Number | Date | Location | Church/BVC Check Payments to CARPET VENDOR | Cash Kickbacks Paid to MACKENZIE |
|---|---|---|---|---|
| | | performed | | |
| 42 | 10/6/2011 | BVC | $2,656 | $300 |
| 43 | 12/3/2011 | No work performed | $23,659 | $12,000 |
| 44 | 12/9/2011 | Church | $1,284 | $400 |
| 45 | 1/6/2012 | BVC | $7,809 | $500 |
| TOTALS | | | $366,580 | $117,450 |

### The Contractor Kickback Scheme

44. LARRY REARDON (the "CONTRACTOR"), was an independent construction contractor, who performed mostly residential and light commercial construction. In or about 2007, the CARPET VENDOR introduced the CONTRACTOR to MACKENZIE. Following this introduction, from in or about 2007 to in or about 2010, MACKENZIE used his influence and authority within the Church to assist the CONTRACTOR in obtaining construction work with the Church. In exchange for MACKENZIE's assistance, MACKENZIE collected thousands of dollars in cash kickbacks from the CONTRACTOR.

45. According to the CONTRACTOR, the kickback arrangement with MACKENZIE generally occurred as follows:

   a. MACKENZIE would direct the CONTRACTOR to submit a quote for construction work to be performed at the Church and/or the BOSTONVIEW APARTMENTS. After the CONTRACTOR submitted the job quote and received approval from the Church, the Church would agree to pay the CONTRACTOR an initial installment or deposit check.

   b. MACKENZIE would notify the CONTRACTOR in advance that the Church would be making a payment to the CONTRACTOR, and MACKENZIE would hand deliver such check to the CONTRACTOR at the Church.

   c. MACKENZIE would then tell the CONTRACTOR that MACKENZIE needed money and would request a dollar amount that MACKENZIE wanted the CONTRACTOR to pay MACKENZIE in cash.

-22-

d.  Either the same day or within a few days of receiving the Church payment, the CONTRACTOR would pay MACKENZIE in cash as per MACKENZIE's demands, and the CONTRACTOR would make a notation on the CONTRACTOR's corresponding invoice or payment stub.

e.  For example, in 2007, MACKENZIE used his influence to get the CONTRACTOR an approximately $27,500 job to remodel an office within the Church, which was paid to the CONTRACTOR in three installments.  At around each time that the Church paid an installment to the CONTRACTOR, MACKENZIE would demand and then receive a cash payment from the CONTRACTOR.  With respect to the total cash payments that the CONTRACTOR paid to MACKENZIE on this approximately $27,500 job, the CONTRACTOR wrote notes on the final invoice in order to keep track of the CONTRACTOR's cash kickbacks to MACKENZIE, as follows:

**E-STOCK**
**1,700- 5/26/07**
**1,500 – 7/15/07**
**3,000   8/1/07**
**6200  owe me**

f.  Thus, for this $27,500 contracting job in 2007, MACKENZIE collected a total of $6,200 in cash kickbacks from the CONTRACTOR, which were all collected by MACKENZIE at the Church, according to the CONTRACTOR.  To conceal these payments, the CONTRACTOR's handwritten notations referred to the MACKENZIE cash payments as "E-STOCK," or "estimated stock (supplies)," but in reality these payments were cash kickbacks, and not figures for estimated stock.

46.  In at least two instances in 2010, MACKENZIE used his influence at the Church to

assist the CONTRACTOR to obtain jobs that were paid for by the Church, but were performed at

MACKENZIE's and MACKENZIE's relatives' homes.  For one job, the CONTRACTOR was

paid by the Church to perform repair work at the MACKENZIE RESIDENCE, as the result of a

broken fish tank – a tank which MACKENZIE had obtained through another kickback scheme

(detailed below).  In another instance, the CONTRACTOR was paid by the Church to perform

construction work at the home of RONALD MACKENZIE and MARIA MACKENZIE,

-23-

MACKENZIE's brother and sister-in-law.[14]  MACKENZIE collected a cash kickback of approximately $1,500 from the CONTRACTOR for the work performed at MACKENZIE's home.

47.  According to the CONTRACTOR, on or about March 5, 2010, MACKENZIE directed the CONTRACTOR to cash a BVC check payable to the CONTRACTOR for $20,460 (for a $61,380 contract that the Church awarded to the CONTRACTOR) and give MACKENZIE $6,000 in cash.  The CONTRACTOR cashed the check and handed $6,000 in cash to MACKENZIE at the Rockland Trust Bank parking lot in Weymouth on or about the same date.

48.  In or about December 2010, after the CONTRACTOR received a BVC check for $10,230 for the above-referenced $61,380 contract, MACKENZIE directed the CONTRACTOR to pay MACKENZIE another $6,000 in cash.  The CONTRACTOR withdrew $6,000 in cash and met MACKENZIE inside the CONTRACTOR's car at a supermarket parking lot in Weymouth.  Inside the CONTRACTOR's car, however, the CONTRACTOR handed MACKENZIE an envelope containing only $3,000 in cash.  After counting the cash, MACKENZIE yelled "What the fuck," then stated that the money was a matter of life or death, and jumped out of the car, slammed the door, and began banging on the hood of the CONTRACTOR's car.  When MACKENZIE re-entered the CONTRACTOR's car, the CONTRACTOR handed MACKENZIE the additional $3,000 in cash, and MACKENZIE got back in MACKENZIE's car and drove away.

49.  An approximate summary of MACKENZIE's total kickbacks from the CONTRACTOR as per this scheme is as follows:

---

[14]      RONALD and MARIA MACKENZIE were married to each other, and both were voting Church members. RONALD was paid by the Church for purported janitorial work, while MARIA held official positions within the Church, including the position of Church President.  In addition, their son, RONALD MACKENZIE JR., received Church tuition benefits and jobs from Church contractors through MACKENZIE's influence.

| Job Description | Church/BVC Payment Date | Church/BVC Check Payment to CONTRACTOR | Cash Kickback Paid to MACKENZIE (at Church unless *) |
|---|---|---|---|
| Church Office Remodel | 5/24/2007 | $9,500 | $1,700 |
| | 7/30/2007 | $9,000 | $1,500 |
| | 10/18/2007 | $9,000 | $3,000 |
| Church Shower Installation | 11/13/2009 | $4,975 | $800 |
| Water Damage at MACKENZIE's home | 1/7/2010 | $7,860 | $1,500 |
| Waterproofing at MACKENZIE's brother's home | 4/7/2010 | $4,860 | -----[15] |
| Church Hallways | 1/21/2010 | $20,460 | -----[16] |
| | 3/5/2010 | $20,460 | $6,000* |
| | 12/7/2010 | $10,230 | $6,000* |
| **Totals** | | **$96,345** | **$20,500** |

### The Painting Company Kickback Scheme

50.   MARIANNE BAKER (the "PAINTER") was a waitress, who knew MACKENZIE for decades after being introduced to MACKENZIE through a mutual friend. JOHN BAKER, the PAINTER's husband, was a restaurant manager (the "PAINTER's HUSBAND, together with the PAINTER, the "PAINTERS"). MACKENZIE used his influence within the Church to give the PAINTERS Church membership, and assisted the PAINTERS in obtaining an approximately $18,000 Church tuition grant for the PAINTERS's nephew to attend Suffolk University in or about 2010.

---

[15]   Although MACKENZIE allegedly did not collect a kickback on the Church-subsidized work at MACKENZIE's brother's home, the CONTRACTOR was never paid for the thousands of dollars of cost overruns on this job.
[16]   The CONTRACTOR could not recall the specific details regarding cash payments to MACKENZIE for this particular check.

51.  In or about 2009, the PAINTER, the PAINTER's restaurant co-worker (Will Rodrigues), and the co-worker's friend (Christopher Hebert) formed Metro City Painting Services, Inc. (the "PAINT CO.")  MACKENZIE then asked the PAINTER to submit a bid to perform painting work at the Church and the BOSTONVIEW APARTMENTS despite the fact that the PAINTERS had little or no previous experience in painting work.

52.  In an interview with FBI and IRS-CID agents on or about April 1, 2013, the PAINTER stated that after the PAINT CO. received approval for its first painting job at the BOSTONVIEW APARTMENTS (in approximately May 2009, according to WINN MANAGEMENT records), MACKENZIE approached the PAINTER outside the Church and stated to the PAINTER, in sum and substance: "You're approved, but to make this a done deal, you gotta take care of me." At this time, the PAINTER understood MACKENZIE to be demanding a cash kickback in return for MACKENZIE's assistance to the PAINTER in obtaining painting work with the Church and the BOSTONVIEW APARTMENTS.[17]

53.  In or about May 2009, MACKENZIE notified the PAINTER that MACKENZIE had a check payable from BVC to the PAINT CO.  When MACKENZIE handed the BVC check to the PAINTER inside the Church, MACKENZIE told the PAINTER that MACKENZIE expected a cash payment from the PAINTER in return.  The PAINTER then had the PAINTER's HUSBAND make a cash withdrawal from [either] the PAINT CO.'s bank account [or the PAINTERS's' personal bank account,] and handed the cash to MACKENZIE.

54.  In one instance, in or about August 21, 2009, MACKENZIE assisted the PAINTER in receiving a payment for a paint contract (to paint the Church function room) that the PAINT CO. never performed.  After the PAINTER received an approximately $6,560 BVC payment for

---

[17]     The PAINTER knew of MACKENZIE's prior criminal association with James "Whitey" Bulger, and the PAINTER's HUSBAND, like many others whom MACKENZIE had introduced to the Church, received from MACKENZIE a signed copy of MACKENZIE's autobiography, "Street Soldier," upon meeting MACKENZIE.

this contract, MACKENZIE told the PAINTER to pay MACKENZIE approximately $5,000 in cash for this contract, and that if the PAINT CO. had to paint the Church function room in the future, MACKENZIE would reimburse the PAINTER later.

55. From in or about May 2009 to in or about October 2009, MACKENZIE used his influence and authority within the Church to assist the PAINT CO. in obtaining a total of approximately $127,129 in painting contracts with the Church and the BOSTONVIEW APARTMENTS. Based upon BVC and Church records, PAINT CO. and PAINTER bank records, and statements from the PAINTERS, the PAINTERS made the following approximate cash withdrawals and check payments on the following approximate dates to MACKENZIE during the period of the kickback scheme:

| BVC Payment Date | Paint Contract | BVC Payment to PAINT CO. | PAINT CO. Transaction Date(s) | PAINT CO. Cash Withdrawal/ Payment[18] |
|---|---|---|---|---|
| 5/14/2009 | Paint Bldg Stairwells 30% D[own] | $6,840 | 5/12/2009 – check to MACKENZIE | $1,000 |
| 5/28/2009 | Paint Bldg Stairwells 2nd 3[rd] | $6,840 | | |
| 6/12/2009 | Paint Bldg Stairwells-Final | $9,120 | | |
| 6/25/2009 | Paint Parking Garage-30% Down | $8,055 | 6/26/2009 – check to MACKENZIE | $3,500[19] |
| 7/14/2009 | Paint Parking Garage-25% Upon Co | $6,712 | | |
| 7/14/2009 | Paint Parking Garage-25% Upon Co[mpletion] | $6,712 | | |
| 7/14/2009 | Apply Neoprene Traffic Coating | $11,125 | 7/16/2009 – cash withdrawal | $7,350 |
| 7/23/2009 | Paint Parking Garage Final Payment | $5,370 | 7/22/2009 – cash withdrawal | $600 |

---

[18]      The process of obtaining and reviewing the total cash withdrawal histories for the PAINTERS's personal bank accounts is ongoing. Shaded cell areas signify that additional bank and financial records are required in order to complete the data entry.
[19]      FILLABUSTER bank records showed that this check payable to MACKENZIE was endorsed by MACKENZIE and then deposited into the FILLABUSTER bank account on or about June 26, 2009.

| BVC Payment Date | Paint Contract | BVC Payment to PAINT CO. | PAINT CO. Transaction Date(s) | PAINT CO. Cash Withdrawal/ Payment[18] |
|---|---|---|---|---|
| 7/30/2009 | Garage Floor Payment #2 Ramps | $11,125 | 7/27/2009 – check to MACKENZIE | $320 |
| 8/4/2009 | Traffic Coating Basement Level | $11,000 | 8/1/2009 – check to MACKENZIE | $400 |
| 8/14/2009 | Paint Church hallways/office #1 | $4,030 | 8/18/2009 – cash withdrawal | $1,400 |
| 8/15/2009 | Church painting job | $2,640 | 8/19/2009- 8/21/2009 – cash withdrawals | $1,500 |
| 8/21/2009 | Paint Church function room | $6,560 | 8/20/2009 – check to MACKENZIE | $600 |
| 9/3/2009 | Paint Church hallways/office #2 | $3,100 | 8/26/2009 – cash withdrawal | $4,200 |
| 9/9/2009 | Church façade painting/updating | $10,360 | 9/8/2009- 9/14/2009 – cash withdrawals | $1,000 |
| 9/11/2009 | Paint Church hallways/office #3 | $2,000 | 9/14/2009 – cash withdrawal | $5,500 |
| 9/29/2009 | Church façade painting/updating | $10,360 | 9/30/2009 – check to MACKENZIE | $400 |
| 10/13/2009 | Church façade painting/updating | $5,180 | 10/15/2009- 10/19/2009 – cash withdrawals | $1,100 |
| **TOTALS** | | **$127,129** | | **$24,370** |

## The Pipe Replacement, Boiler Replacement, and Booster Pump Kickback Schemes

56.     From in or about 2007 to in or about 2011, major renovations were done at the

BOSTONVIEW APARTMENTS. As the Director of Operations, MACKENZIE exercised

influence and authority with respect to choosing the vendors that were to perform each of the

renovations. For each renovation project, MACKENZIE collected thousands of dollars in cash

kickbacks from the vendors. The renovations, vendors, principals, and approximate dates are as

follows:

| Dates | Project | Vendor | Principals |
|---|---|---|---|

| Dates | Project | Vendor | Principals |
|-------|---------|--------|------------|
| 2006-2007 | Pipe Replacement | ASAP PLUMBING AND HEATING | THOMAS DEROSA |
| 2007 | Pipe Replacement | NIGHTINGALE CONSTRUCTION CO. INC. | MICHAEL TRAVERS |
| 2010-2011 | Boiler Replacement | SUPERIOR PLUMBING INC. | WILLIAM LANE DAVID DOHERTY |
| 2011 | Booster Pump Installation | SUPERIOR PLUMBING INC. | WILLIAM LANE DAVID DOHERTY |

Pipe Replacement Project

57. In or about 2006, the Church decided to replace all of the hot water pipes in the

BOSTONVIEW APARTMENTS. In or about late 2006 to early 2007, WINN MANAGEMENT

(the managing company for the BOSTONVIEW APARTMENTS at that time) assisted the

Church with the bidding process and ultimately awarded Superior Plumbing Inc. ("SUPERIOR

PLUMBING") the contract to replace the hot water pipes. WINN MANAGEMENT was

familiar with SUPERIOR PLUMBING because SUPERIOR PLUMBING had worked in other

properties managed by WINN MANAGEMENT. WILLIAM LANE was the owner of

SUPERIOR PLUMBING, and DAVID DOHERTY was the foreman at SUPERIOR

PLUMBING, who oversaw the pipe replacement work performed at the BOSTONVIEW

APARTMENTS.

58. THOMAS DEROSA was a self-employed plumber (the "PLUMBER"), who did

business as ASAP Plumbing and Heating ("ASAP PLUMBING") and mostly worked on small

residential plumbing projects. In or about 2006, DOUG HANSON, the Church Treasurer and a

MACKENZIE associate, introduced the PLUMBER to MACKENZIE. Following this

introduction, the PLUMBER was appointed to be the overseer for the entire pipe replacement

project despite the fact that the PLUMBER had neither the experience nor expertise to supervise

such a project. In addition, the Church and BVC began paying the PLUMBER thousands of

-29-

dollars before the pipe replacement work even commenced. Once the pipe replacement work

commenced, the PLUMBER showed up less and less frequently to the jobsite, and during the

latter stages of the project when the PLUMBER was present, the PLUMBER's sole contribution

to the project was providing soft drinks to the laborers, according to SUPERIOR PLUMBING's

foreman, DAVID DOHERTY.

     59. On or about December 4, 2012, the PLUMBER testified before a Federal Grand Jury

in Boston (the "Grand Jury"). During the PLUMBER's testimony, the PLUMBER stated that:

    a. After the Church began paying the PLUMBER in or about 2006, MACKENZIE
        began to meet regularly with the PLUMBER, and that the nature of such meetings
        was "basically I was going to give him [MACKENZIE] money for getting the job."

    b. "[W]hen I started getting my biweekly checks, I would cash—you know, deposit it,
        deposit it in my account, the ASAP [Plumbing] account; and I don't know, maybe
        whatever, two days, whatever it was, I would – I would either go in and meet him in
        the – in the [Church] kitchen or in his [Church] office for, you know, just one of
        those two places. ... I would just give him some money. ... Sometimes I put it in an
        envelope, if I got it from the bank; or sometimes I would just hand it to him in cash."

     60. A review of Church and BVC payments to the PLUMBER and the PLUMBER's

bank records revealed the following payments and transactions (on the approximate dates),

which corroborated the PLUMBER's cash kickbacks paid to MACKENZIE pursuant to this

scheme:

| Payment Date | Church/BVC Payment to PLUMBER | Cash Withdrawal Date(s) | Cash Withdrawal Amount |
|---|---|---|---|
| 7/28/2006 | $5,000 | 8/2/2006 | $3,500 |
| 8/18/2006 | $5,000 | 8/23/2006 | $3,500 |
| 12/8/2006 | $15,000 | 12/22/2006 | $6,000 |
| 2/7/2007 | $9,600 | No deposit record for $9,600 | |
| 6/1/2007 | $6,000 | 6/6/2007 | $1,500 |
| 7/6/2007 | $13,526 | 7/10/2007 | $3,600 |
| 7/20/2007 | $13,526 | 7/24/2007 | $3,500 |
| 8/3/2007 | $13,526 | 8/3/2007,8/13/2007 | $3,500 |
| 8/20/2007 | $13,526 | 8/22/2001 | $3,500 |
| 8/31/2007 | $13,526 | 9/4/2007 | $3,500 |

| Payment Date | Church/BVC Payment to PLUMBER | Cash Withdrawal Date(s) | Cash Withdrawal Amount |
|---|---|---|---|
| 9/18/2007 | $13,526 | 9/18/2007 | $3,500 |
| 9/28/2007 | $13,526 | 10/3/2007 | $3,500 |
| 10/12/2007 | $13,526 | 10/16/2007 | $3,500 |
| **Totals** | **$148,808** | | .$42,600 |

61. In order to replace and repair the hot water pipes at the BOSTONVIEW APARTMENTS, it was necessary to hire a contractor that would open the apartment walls and then repair the walls once the pipes were replaced. In or about 2007, RAFFOL (the WINN MANAGEMENT executive who had paid tuition grant kickbacks to MACKENZIE) contacted MICHAEL TRAVERS ("WALL VENDOR"), who owned a small contracting company called Nightingale Construction Co. Inc. ("NIGHTINGALE"), about this job.

62. On December 18, 2012, the WALL VENDOR told the Grand Jury that in or about 2007, RAFFOL called the WALL VENDOR and stated, "You can have the job; the numbers will work. But you have to – have to pay. The Board wants money back." At this time, RAFFOL did not tell the WALL VENDOR who was to receive the money, but stated that the WALL VENDOR had to pay "[t]wenty-four grand." The WALL VENDOR agreed to make this payment, and then, with RAFFOL's approval, inflated the contract bid to the Church up to an amount of approximately $330,000 to account for this $24,000 payment.

63. In or about 2007, at a pre-construction meeting attended by the WALL VENDOR, RAFFOL,MACKENZIE and the other contractors on the job, RAFFOL instructed the WALL VENDOR that "[MACKENZIE] ... that's the guy you're, you know, you'll be dealing with[,]" meaning that the WALL VENDOR was to pay MACKENZIE the $24,000 kickback payment that RAFFOL had previously discussed with the WALL VENDOR.

64. According to the WALL VENDOR in an interview with the FBI on April 5, 2011, in or about 2007, after the WALL VENDOR began doing work at the BOSTONVIEW APARTMENTS, RAFFOL called the WALL VENDOR and stated, in sum and substance, "You've got to pay Ed." Shortly thereafter, MACKENZIE approached the WALL VENDOR at the job site and told the WALL VENDOR that the Church was currently processing the WALL VENDOR's next payment. After the WALL VENDOR received a $20,000 payment from BVC, the WALL VENDOR withdrew $2,500 in cash on August 3, 2007 and $4,000 in cash on September 18, 2007. At or about the time of these withdrawal dates, the WALL VENDOR then met MACKENZIE at the Church and paid MACKENZIE a total of approximately $5,500 in cash from these funds. The WALL VENDOR described one such payment for the Grand Jury:

a. "I went over to his [Church] office, which the buildings are connected, so just walked through the building and met him in the kitchen. ... I put the money in – under a magazine and said, 'Here, you know, there you go.' And that's when he [MACKENZIE] said about divvying it up with everybody. He said he had to divvy it up with the Board or the boys...." The WALL VENDOR was unaware if MACKENZIE had, in fact, distributed the cash kickback to anyone other than MACKENZIE.

65. The WALL VENDOR, however, told RAFFOL that the WALL VENDOR was uncomfortable making these cash payments to MACKENZIE and preferred to make these payments with a check. After this conversation, RAFFOL instructed the WALL VENDOR to make check payments to FILLABUSTER, which was MACKENZIE's shell company (see Section I, above). According to the WALL VENDOR's testimony and bank records, the WALL VENDOR made the following kickback payments to MACKENZIE during the course of this scheme (on the approximate dates for the approximate amounts):

| Date | WALL VENDOR Kickback to MACKENZIE | Amount |
|------|-----------------------------------|--------|
| 8/3/2007 | Two cash withdrawals made to make a single cash payment | $5,500 |
| 9/18/2007 | | |

| Date | WALL VENDOR Kickback to MACKENZIE | Amount |
|---|---|---|
| | to MACKENZIE | |
| 10/24/2007 | NIGHTINGALE check to FILLABUSTER | $8,500 |
| 12/7/2007 | NIGHTINGALE check to FILLABUSTER | $5,000 |
| 12/17/2007 | NIGHTINGALE check to FILLABUSTER | $5,000 |
| **Total** | | **$24,000** |

The Boiler Replacement and Booster Pump Installation Projects

66. After SUPERIOR PLUMBING completed the BOSTONVIEW APARTMENTS

pipe replacement project, in or about 2010, DAVID DOHERTY, the SUPERIOR PLUMBING

job foreman ("FOREMAN"), contacted PATRICK ANDERSEN, a BOSTONVIEW

APARTMENTS maintenance worker (the "MAINTENANCE WORKER"), and asked the

MAINTENANCE WORKER if the BOSTONVIEW APARTMENTS needed to replace their

boilers.

67. In his December 11, 2012 testimony before the Grand Jury, the FOREMAN stated

that in or about 2010:

a. The MAINTENANCE WORKER responded "[L]ook, I'm just the maintenance guy. If – you have to go talk to Eddie [MACKENZIE] with that, he's the director of operations...."

b. Following his conversation with the MAINTENANCE WORKER, the FOREMAN met with MACKENZIE inside the Church offices. After the FOREMAN proposed the boiler project to MACKENZIE, MACKENZIE told the FOREMAN that "[T]hat's [MACKENZIE's] job, that he, you know, he's in charge of director of operations .... so he would definitely talk to the people [other Church Trustees or officials] about it, and that, yeah, he was the right person."

c. Then, MACKENZIE led the FOREMAN outside to a back alley near the Church and MACKENZIE told the FOREMAN that "when the work goes on in the church that [MACKENZIE] gets ten percent of it."

-33-

    d.    MACKENZIE then instructed the FOREMAN that "you'll have to talk to your boss about it and get back to me[,]" and that the FOREMAN was to serve as a middleman for the kickbacks paid to MACKENZIE from the owner of SUPERIOR PLUMBING (WILLIAM LANE).

    e.    MACKENZIE also agreed to pay the FOREMAN a percentage of the kickback for acting as the middleman between MACKENZIE and the WILLIAM LANE.

68. During interviews with FBI and IRS-CID special agents on July 17, 2012 and July 19, 2012, the FOREMAN stated that, as part of the scheme, MACKENZIE did not want to discuss the boiler project over the telephone with the FOREMAN. Instead, MACKENZIE instructed the FOREMAN that whenever the FOREMAN wanted to discuss the boiler project, the FOREMAN was to say "Ed, let's go get a coffee," which would signal to MACKENZIE that the two were to meet in person at or near the Church.

69. After the FOREMAN's meeting with MACKENZIE, the FOREMAN met with WILLIAM LANE, the owner of SUPERIOR PLUMBING (the "COMPANY OWNER"), and told the COMPANY OWNER that SUPERIOR PLUMBING would receive the contract to install boilers at the BOSTONVIEW APARTMENTS, if the COMPANY OWNER agreed to pay a ten percent kickback to MACKENZIE.

70. On December 18, 2012, the COMPANY OWNER stated to the Grand Jury that, after the FOREMAN broached the BOSTONVIEW APARTMENTS boiler project to the COMPANY OWNER, the COMPANY OWNER ultimately "agreed that [the COMPANY OWNER] would go back and do the project and pay ten percent to Ed MacKenzie." The COMPANY OWNER then, in or about December 2010, submitted to the Church, via electronic mail, an inflated bid to install boilers at the BOSTONVIEW APARTMENTS for approximately $274,000, which included an approximately $27,400 kickback that was to be paid to MACKENZIE.

-34-

71. After the COMPANY OWNER received an initial payment from the Church on the boiler project, the FOREMAN told the Grand Jury that, in or about December 2010, the FOREMAN met the COMPANY OWNER in a parking lot in Weymouth off of Route 18, where the COMPANY OWNER handed the FOREMAN an envelope containing approximately $17,000 in cash. Later, that same date, the FOREMAN met with MACKENZIE at a Dunkin Donuts parking lot in Weymouth, where MACKENZIE told the FOREMAN "[Y]ou can take your portion and give the rest to the woman in the car, the girl in the car." The FOREMAN then informed the Grand Jury: "So I walked out, I took out my money [approximately $3,200], and I gave her the money in the car."[20] The FOREMAN only knew the girl in the car to be a girlfriend of MACKENZIE's.

72. In or about 2011, prior to the boilers being installed, the FOREMAN proposed another project to MACKENZIE, which was an approximately $94,775 bid to install a new water booster pump at the BOSTONVIEW APARTMENTS. Similar to the boiler project: (i) MACKENZIE agreed to use his influence to assist SUPERIOR PLUMBING in obtaining the project, but expected a ten percent cash kickback on the booster pump contract; (ii) the COMPANY OWNER agreed to pay MACKENZIE, through the FOREMAN, a cash kickback of ten percent in return for MACKENZIE's assistance in obtaining the booster pump contract; and (iii) in or about August 2011, the COMPANY OWNER submitted an inflated bid, via electronic mail, to the BOSTONVIEW OFFICE and to MACKENZIE's electronic mail address.

73. In or about August 2011, after BVC made an initial payment of approximately $33,000 to SUPERIOR PLUMBING for the booster pump, the COMPANY OWNER stated to

---

[20]     The FOREMAN also informed the Grand Jury that MACKENZIE was upset that the COMPANY OWNER did not pay the full approximately $27,400 kickback, but rather only $17,000 in December 2010. To appease MACKENZIE, about a week after the $17,000 cash payment, the FOREMAN paid MACKENZIE back approximately $2,700 in cash of the $3,200 middleman fee that the FOREMAN originally collected.

-35-

the Grand Jury that the COMPANY OWNER met the FOREMAN in "an empty lot in

Weymouth," where the COMPANY OWNER handed the FOREMAN approximately $9,400 in

cash, which represented the ten percent kickback to be paid to MACKENZIE on the booster

pump contract.

74. After the FOREMAN received the approximately $9,400 in cash from the

COMPANY OWNER, the FOREMAN told the Grand Jury that: "I got the money and then ...

the next day I had to meet [MACKENZIE] up at the church." The FOREMAN then stated that,

inside the Church kitchen, he handed MACKENZIE an envelope containing the approximately

$9,400 cash kickback from the COMPANY OWNER. MACKENZIE then gave the FOREMAN

approximately $1,000 in cash as the FOREMAN's share for acting as MACKENZIE's

middleman.

75. In or about October/November 2011, MACKENZIE continued to pressure the

FOREMAN to obtain the final approximately $10,000 kickback owed to MACKENZIE by the

COMPANY OWNER on the boiler contract. In statements to the Grand Jury and law

enforcement, the FOREMAN recounted that after BVC made a final payment on the boiler

project to SUPERIOR PLUMBING in late 2011, the COMPANY OWNER gave the FOREMAN

approximately $10,000 in cash in an envelope. The FOREMAN then took this cash and gave it

to MACKENZIE at the Church's offices. As compensation for acting as MACKENZIE's

middleman, MACKENZIE handed the FOREMAN back approximately $3,700 in cash ($1,000

for this delivery, and $2,700 returned from the earlier middleman fee that MACKENZIE took

from the FOREMAN). A summary of the approximate dates and amounts of the cash kickback

payments to MACKENZIE on the boiler and booster pump schemes is as follows:

| Dates | Project | MACKENZIE kickback | FOREMAN's share | MACKENZIE net kickback |
|-------|---------|--------------------|-----------------|------------------------|
| Dec. 2010 | Boilers | $17,000 | $3,200 | $13,800 |

| Dates | Project | MACKENZIE kickback | FOREMAN's share | MACKENZIE net kickback |
|---|---|---|---|---|
| Aug. 2011 | Booster Pump | $9,400 | $1,000 | $8,400 |
| Oct.-Nov. 2011 | Boilers | $10,000 | $1,000 | $9,000 |
| **Totals** | | **$36,400** | **$5,200** | **$31,200[21]** |

### The Fish Aquarium Kickback Scheme

76. In or about 2005, MACKENZIE went to Lovely Pets, Inc. (the "AQUARIUM

STORE"), a store in Quincy that sold fish tank aquariums, fish, and provided aquarium supplies

and maintenance services. STEPHEN RICHMOND was the owner of the AQUARIUM STORE

("AQUARIUM OWNER"). During this initial meeting, MACKENZIE told the AQUARIUM

OWNER that MACKENZIE was interested in purchasing an aquarium for the second floor of

the Church.

77. Following this initial meeting, MACKENZIE used his influence and authority to

cause the Church and BVC to purchase from the AQUARIUM STORE one fish aquarium for the

second floor of the Church and one fish aquarium for the BOSTONVIEW APARTMENTS

lobby. The fish tank aquariums, fish, supplies, and maintenance services (initially,

approximately $400-$500 per month) cost the Church thousands of dollars each year. According

to the AQUARIUM OWNER's statements to FBI and IRS agents on December 12, 2012,

MACKENZIE made all decisions regarding the aquariums (e.g., the choice of tank size, the fish,

and tank accessories), and MACKENZIE told the AQUARIUM OWNER on several occasions

that "I'm the boss."

---

[21]        The FOREMAN also told the Grand Jury that in late 2011, the FOREMAN obtained work as an
independent sub-contractor to renovate the second floor bathrooms at the BOSTONVIEW APARTMENTS at a cost
of approximately $10,500. The FOREMAN was only paid approximately $7,500 from BVC through the contractor,
JOHN O'BRIEN (a BVC carpenter). From this $7,500, the FOREMAN paid MACKENZIE an approximately
$1,000 cash kickback. MACKENZIE accepted the $1,000 cash kickback, but intimated that this cash payment
should have gone to MICHAEL SNEDEKER (another MACKENZIE associate and BVC employee), who had
arranged for the Church bathroom renovation. (MICHAEL's father, JACK SNEDECKER, was another
MACKENZIE associate at the Church.)

78. In or about 2007, after the Church purchased the first two aquariums for approximately $7,162 and $5,550, respectively, MACKENZIE regularly told the AQUARIUM owner that MACKENZIE planned on having a fish aquarium installed in his new house, the MACKENZIE RESIDENCE, in Weymouth. At around the same time, MACKENZIE also proposed to install a third fish aquarium (the "Third Fish Tank") inside the Church Reverend's office. Prior to in or about March 2007, according to the AQUARIUM OWNER, MACKENZIE directed the AQUARIUM OWNER to bill BVC in advance for the Third Fish Tank.

79. In or about March 2007, after BVC mailed a check for approximately $5,177 to the AQUARIUM OWNER for the Third Fish Tank, MACKENZIE: (i) directed the AQUARIUM OWNER to install the Third Fish Tank at the MACKENZIE RESIDENCE, instead of the Church; and (ii) told the AQUARIUM OWNER that when it came time to install the actual third Church fish tank at the Church (the "Fourth Fish Tank"), MACKENZIE would pay for the Fourth Fish Tank himself.

80. In or about 2007, the AQUARIUM OWNER made preparations to install the Fourth Fish Tank at the Church. According to the AQUARIUM OWNER, in a meeting at the AQUARIUM STORE, MACKENZIE stated to the AQUARIUM OWNER, "I wish somehow we could bill this (meaning the Fourth Fish Tank) to the church[,]" instead of having MACKENZIE pay for it as MACKENZIE originally proposed. The AQUARIUM OWNER replied, "I gotcha," with the understanding that MACKENZIE was not going to pay for any of the costs of the Fourth Fish Tank.

81. According to the AQUARIUM OWNER: (i) MACKENZIE never paid for the Third Fish Tank at the MACKENZIE RESIDENCE, or for the monthly maintenance that the AQUARIUM STORE provided for the Third Fish Tank; (ii) MACKENZIE never paid for the

Fourth Fish Tank after the Fourth Fish Tank was installed at the Church; and (iii) the

AQUARIUM OWNER understood that if the AQUARIUM OWNER wanted to maintain the

lucrative aquarium business with the Church, the AQUARIUM OWNER could not charge

MACKENZIE for any of the costs associated with the Third Fish Tank.

82. In his January 22, 2013 testimony to the Grand Jury, the AQUARIUM OWNER

admitted that to recoup the costs to the AQUARIUM OWNER for the Third Fish Tank (at the

MACKENZIE RESIDENCE), including free fish and free tank service and maintenance for the

Third Fish Tank, the AQUARIUM "over billed and padded the bill" with respect to tank service

and maintenance invoices charged to the Church from in or about 2007 to in or about 2011. A

summary chart of MACKENZIE's fish tank kickback scheme is as follows:

| Fish Tank No. | Appx. Date Installed | Location of Tank | Payor | Tank Cost | Appx. Monthly Maintenance Cost through 2011 |
|---|---|---|---|---|---|
| 1 | 8/2005 | Church 2nd Floor | BVC | $7,162 | $300 |
| 2 | 11/2005 | Bostonview Lobby | BVC | $5,550 | $300 |
| 3 | 3/2007 | **MACKENZIE RESIDENCE** | **BVC** | **$5,177** | **$100-150** |
| 4 | 7/2007 | Church Rev. Office | The Aquarium Owner did not charge the Church for the Fourth Fish Tank because the Church had already paid $5,177 for it in March 2007. Instead, to recoup the costs for the "free" Third Fish Tank that MACKENZIE had received, the AQUARIUM OWNER padded certain tank maintenance bills to the Church. | | |

## D.    Tax Offenses

83. There also is probable cause to believe that MACKENZIE violated Title 26, United

States Code, Section 7206(1) by willfully making and subscribing to false tax returns with

respect to the 2007, 2008, 2009, 2010, and 2011 tax years. According to an IRS-CID agent who

is investigating this matter, the IRS has retrieved records pertaining to MACKENZIE's 2007,

2008, 2009, 2010, and 2011 Form 1040 U.S. Individual Tax Returns that MACKENZIE filed.

MACKENZIE has made and subscribed to the Form 1040 returns. A reading of the 2007, 2008,

2009, 2010, and 2011 returns reveals that they were subscribed to under penalties of perjury and certify that the responses on the returns were true, complete and accurate.[22] MACKENZIE's returns and return information reveal the following relevant entries relating to income for tax years 2007, 2008, 2009, 2010, and 2011.

| ITEM | TAX YEAR 2007 | TAX YEAR 2008 | TAX YEAR 2009 | TAX YEAR 2010 | TAX YEAR 2011 |
|---|---|---|---|---|---|
| Wages | $104,832 | $107,374 | $132,500 | $106,500 | $118,650 |
| Business Income | 0 | $135 | -$21,581 | $1,559 | $6,046 |
| Other Income | $9,339 | 0 | $3,000 | 0 | $12,786 |
| Total Reported Income | $114,171 | $107,509 | $113,919 | $108,059 | $137,482 |
| **Total Unreported Income from Corrupt Payments/Benefits** | **$147,412** | **$65,850** | **$77,562** | **$77,550** | **$83,293** |
| **Total Approximate Unreported Income from 2007-2011** | **$451,667** | | | | |

84. A review of these returns and return information reveals that the "Wages" amount were the wages that the MACKENZIE received from the Church. The "Business Income" amount refers to income listed on Schedule C to such returns that MACKENZIE attributed to: (i) in 2008, "ed Mackenzie JR DBA e/m," involved in "R/e consulting," with a business address at the Church; (ii) in 2009, "ed mack JR DBA E/M/R," involved in the business of "R/e Consulting + Aid, " with the business address at the Church; (iii) in 2010, a company called "MACKENZIE CONSTRUCTI[ON]," with no business address; and (iv) in 2011, an IRS Form 1099-MISC that was issued by the BOSTONVIEW APARTMENTS to MACKENZIE for

---

[22]    The tax return for the year 2010 was electronically filed. However, MACKENZIE signed an IRS Form 8879, which attested to the veracity of the 2010 return under the penalties of perjury.

$8,500, which MACKENZIE categorized as "All other professional, scientific, & technical services," without listing any business name on the IRS Form 1099-MISC. The "Other Income" refers to: (i) in 2007, $9,339 in income reported on an IRS Form 1099; (ii) in 2009, $3,000 in "Gambling wins;" and (iii) in 2011, $12,786 in income reported on a handwritten IRS Form 1099-MISC, purportedly issued from the Church to MACKENZIE. A review of this information reported by MACKENZIE reveals no entry for the amounts of money that MACKENZIE received, directly and indirectly, from MACKENZIE's involvement in the corrupt schemes described above. Moreover, there are no entries that account for the total payments and/or funds diverted to FILLABUSTER and COURMAC on MACKENZIE's tax returns. Accordingly, there is probable cause to believe that MACKENZIE made, subscribed to and filed false federal individual tax returns for tax years 2007, 2008, 2009, 2010, and 2011.

### E.   Narcotics Trafficking

85. There is probable cause to believe that MACKENZIE violated Title 21, United States Code, Section 841 by selling illegal drugs. From February 11, 2013 through February 14, 2013, special agents with the U.S. Drug Enforcement Administration (the "DEA Agents") communicated telephonically and in-person with a registered DEA confidential source (the "CS"), who has provided reliable and corroborated information in the past to the DEA Agents. The DEA Agents were neither involved in, nor cognizant of, the facts underlying the instant investigation of MACKENZIE or the Church prior to being contacted by the CS in this matter. During the initial communication between the CS and the DEA Agents, the CS volunteered that the CS had information regarding MACKENZIE's ongoing sale of narcotics, specifically, oxycodone.

86. During conversations with the DEA Agents, the CS disclosed, in sum and substance:

a.   MACKENZIE was involved in the distribution of multi-hundred pill lots of oxycodone in the Boston area;

b.   Oxycodone pills were purchased for $10-$20 per pill and sold at $30 per pill, with MACKENZIE usually purchasing $10,000 lots of oxycodone pills for distribution;

c.   MACKENZIE provided oxycodone pills to MACKENZIE's girlfriend, who resided at the MACKENZIE RESIDENCE;

d.   MACKENZIE disclosed that MACKENZIE had access to a safe at the Church, which MACKENZIE used for the storage of oxycodone pills.

87.   During their conversations with the CS, the DEA Agents were able to corroborate certain details of the CS's account, including the CS's knowledge of: (i) MACKENZIE's current cellular telephone number; (ii) the make and model of MACKENZIE's current vehicle; (iii) the identity of MACKENZIE's current girlfriend; and (iv) the current locations of MACKENZIE's residence in Weymouth and business address at the Church.

88.   During a December 12, 2012 interview with the FBI, the AQUARIUM OWNER stated that a former AQUARIUM COMPANY employee, JOHN SOUTHERN, had replaced the AQUARIUM OWNER as the maintenance and service provider for the Church, the BOSTONVIEW APARTMENTS, and the MACKENZIE RESIDENCE fish tank aquariums by in or about early 2012. Prior to replacing the AQUARIUM OWNER, SOUTHERN had disclosed to the AQUARIUM OWNER that: (i) SOUTHERN had grown close to MACKENZIE; (ii) SOUTHERN was aware that MACKENZIE's cars were purchased by the Church; and (iii) SOUTHERN was familiar with MACKENZIE's girlfriends. More significantly, SOUTHERN had confided to the AQUARIUM OWNER that, through SOUTHERN's close relationship with MACKENZIE, SOUTHERN was aware that MACKENZIE was involved in dealing drugs.

89.   On or about March 8, 2013, the DEA Agents obtained prescription pill records for MACKENZIE. Those prescription records showed that from the period from May 26, 2012 to

-42-

February 22, 2013, MACKENZIE had received controlled substances that included

approximately 1,110 pills of oxycodone and 990 pills of clonazepam, which were both in

amounts that exceeded the prescribed dosages (listed on the prescriptions themselves) for such

drugs for such time period.

### F.   Obstruction of Justice

90.  In testimony before the Grand Jury on January 22, 2013, the CONTRACTOR stated

that in or about October or November 2012, after the CONTRACTOR had been contacted by the

FBI, the CONTRACTOR mistakenly dialed MACKENZIE's phone number on the

CONTRACTOR's cellular phone. During the brief conversation that ensued, MACKENZIE

threatened the CONTRACTOR by stating to the CONTRACTOR, in sum and substance:

"Mother fucker, I'm your worst nightmare. Mother[fucker], you're going to fucking die." When

the CONTRACTOR asked MACKENZIE to identify himself over the phone, MACKENZIE

responded: "[Hey], Larry. How you doing? No matter what happens, I still love you. How's the

wife and kids?"

91.  In or about February 2013, the FBI contacted the Church's Treasurer, SUSANNE

ROGERS. ROGERS disclosed to the FBI that, at the Church, on or about February 13, 2013,

MACKENZIE had asked ROGERS to create IRS Form 1099 records for FILLABUSTER for the

past three years. ROGERS did not understand why MACKENZIE was requesting her to create

such records. ROGERS asked MACKENZIE why MACKENZIE was seeking the production of

those records and MACKENZIE became flustered and left ROGERS's office.

92.  Shortly after this meeting, JACK SNEDECKER, a MACKENZIE associate and the

Church's Interim Chief Financial Officer, reminded ROGERS that ROGERS's term as Treasurer

(a salaried position) was about to expire, and that if ROGERS hoped to be re-elected to another

-43-

term as Treasurer, ROGERS needed to "start lobbying" other Trustees for her re-election.

SNEDEKER also added that he would "even talk to Eddie [MACKENZIE]."

## III. SEARCH LOCATIONS AND MATERIALS SOUGHT

93.  In light of the conduct outlined above, I submit that there is probable cause to believe that the specified federal offenses have been committed. I therefore seek search warrants for (A) the CHURCH, (B) the BOSTONVIEW OFFICE, and (C) the MACKENZIE RESIDENCE. I submit that there is probable cause to believe that evidence, fruits and instrumentalities of the specified federal offenses are at the subject locations.

### A. THE CHURCH

94.  The records and items sought from the CHURCH are more particularly described as the evidence, fruits and instrumentalities of the specified federal offenses, to include:

a.  Documents, records, correspondence, contracts and agreements, personnel files, bid proposals, job specifications, invoices and bills, budgets, ledgers, accounting records, tax records, tax forms, tuition payment and tuition grant records, memoranda, notes, e-mails, telephone messages, diary and calendar entries, board minutes, trustee minutes, council minutes, by-laws, charters, certificates of incorporation, membership rolls, membership records and other information, from January 1, 2002 to the present, pertaining to the following:

(continued on following page.)

-44-

| Individuals | Entities |
|---|---|
| a.  Edward J. Mackenzie, Jr.<br>b.  Courtney Mackenzie<br>c.  Carolyn Mackenzie<br>d.  Ronald Mackenzie<br>e.  Ronald Mackenzie, Jr.<br>f.  Maria Mackenzie<br>g.  Lauren Mackenzie<br>h.  Krystal Donnelly (aka Krystal MacDonald)<br>i.  Thomas J. Kennedy<br>j.  John Burke<br>k.  Doug Hanson<br>l.  Michael Snedecker<br>m.  Jack Snedecker<br>n.  Martin Raffol<br>o.  Mathew Raffol<br>p.  Lindsey Raffol<br>q.  Michael Travers<br>r.  Robert Hynes<br>s.  Michael Perry<br>t.  Peter O'Connell<br>u.  Al Nugent<br>v.  Tina Burm<br>w.  Juan Figueroa<br>x.  Mark Palluccio<br>y.  Steven Bourgoin<br>z.  Larry Reardon<br>aa.  Marianne Baker<br>bb.  John Baker<br>cc.  Will Rodrigues<br>dd.  Christopher Hebert<br>ee.  Thomas DeRosa<br>ff.  William Lane<br>gg.  David Doherty<br>hh.  Stephen Richmond<br>ii.  John Southern<br>jj.  Steven (aka Glenn S.) Ellis<br>kk.  Rex Ellis<br>ll.  All Church tuition grant recipients | a.  Fillabuster Catering Trust<br>b.  Fillabusta Food Service<br>c.  Courmac Realty Trust<br>d.  Mackenzie Construction<br>e.  E/M/R (aka E/M) [real estate consulting and construction]<br>f.  Harborview Real Estate Corporation<br>g.  Space Propulsion Systems, Inc.<br>h.  MZA Trust<br>i.  Boston Society of the New Jerusalem, Inc.<br>j.  Bostonview Corp. Board<br>k.  BVC Trust<br>l.  Looney & Grossman<br>m.  Low Overhead Discount Carpet<br>n.  Metro City Painting Services, Inc.<br>o.  ASAP Plumbing and Heating<br>p.  Superior Plumbing Inc.<br>q.  Nightingale Construction Co. Inc.<br>r.  Lovely Pets, Inc.; |

b.  U.S. currency; and

c.  Oxycodone (and records relating to oxycodone).

95. There is probable cause to believe that these materials and information exist at the CHURCH because materials regarding the CHURCH's vendors, contracts, and financial documents are regularly kept by the CHURCH (see below). Moreover, as detailed in the Affidavit, MACKENZIE has conducted parts of this corrupt and unlawful activity inside the CHURCH. For instance, several witnesses (including RAFFOL, the CARPET VENDOR, the CONTRACTOR, the WALL VENDOR, and the FOREMAN) each have stated that MACKENZIE had accepted thousands of dollars in cash kickback payments inside the CHURCH.

96. Further, on or about February 12, 2013, SUSANNE ROGERS, the current Church Treasurer, disclosed to the FBI that records currently stored at the CHURCH include: (i) Church accounting records; (ii) Church vendor files and records; (iii) Church bank records; (iv) Church tax returns and tax statements; (v) Church insurance records; (vi) Church financial statements; and (vii) Church investment records.

97. Furthermore, during an FBI interview on or about February 7, 2013, the current Church President, MARY GUARINO, age 74, stated that the CHURCH stores and maintains organizational documents, including the Church Council and Church Trustee minutes that pertain to all Church business and transactions.

98. Further, there is probable cause to believe that oxycodone may be secreted within the CHURCH because the CS has stated that MACKENZIE informed the CS that MACKENZIE used the CHURCH, specifically, a safe within the CHURCH, as a location to store MACKENZIE's illegal supply of oxycodone. Although the CS had never personally observed the CHURCH safe, the CS's information has been corroborated by ROGERS, who disclosed to the FBI, in or about March 2013, that there is a safe inside the Church, which is accessed by

-46-

MACKENZIE, and whose lock combination consists of digits that correspond with

MACKENZIE's date of birth (6/7/1958).

### B. THE BOSTONVIEW OFFICE

99.     The records and items sought from the BOSTONVIEW OFFICE are more

particularly described as the evidence, fruits and instrumentalities of the specified federal

offenses, to include:

a. Documents, records, correspondence, contracts and agreements, personnel files, bid proposals, job specifications, invoices and bills, budgets, ledgers, accounting records, tax records, tax forms, memoranda, notes, e-mails, telephone messages, diary and calendar entries, and other information, from January 1, 2002 to present, pertaining to the following:

| Individuals | Entities |
|---|---|
| a.   Edward J. Mackenzie, Jr. | a.   Fillabuster Catering Trust |
| b.   Courtney Mackenzie | b.   Fillabusta Food Service |
| c.   Carolyn Mackenzie | c.   Courmac Realty Trust |
| d.   Ronald Mackenzie | d.   Mackenzie Construction |
| e.   Ronald Mackenzie, Jr. | e.   E/M/R (aka E/M) [real estate consulting |
| f.   Maria Mackenzie |     and construction] |
| g.   Lauren Mackenzie | f.   Harborview Real Estate Corporation |
| h.   Krystal Donnelly (aka Krystal | g.   Space Propulsion Systems, Inc. |
|     MacDonald | h.   MZA Trust |
| i.   Thomas J. Kennedy | i.   Boston Society of the New Jerusalem, |
| j.   John Burke |     Inc. |
| k.   Rex Ellis | j.   Bostonview Corp. Board |
| l.   Doug Hanson | k.   BVC Trust |
| m.   Martin Raffol | l.   Looney & Grossman |
| n.   Mathew Raffol | m.   Low Overhead Discount Carpet |
| o.   Lindsey Raffol | n.   Metro City Painting Services, Inc. |
| p.   Michael Travers | o.   ASAP Plumbing and Heating |
| q.   Michael Perry | p.   Superior Plumbing Inc. |
| r.   Peter O'Connell | q.   Nightingale Construction Co. Inc. |
| s.   Al Nugent | r.   Lovely Pets, Inc.; |
| t.   Tina Burm | |
| u.   Juan Figueroa | |
| v.   Steven Bourgoin | |
| w.   Larry Reardon | |
| x.   Marianne Baker | |
| y.   John Baker | |
| z.   Will Rodrigues | |
| aa.   Christopher Hebert | |
| bb.   Thomas DeRosa | |
| cc.   William Lane | |
| dd.   David Doherty | |
| ee.   Stephen Richmond | |
| ff.   John Southern | |

| Individuals | Entities |
|---|---|
| | |

100.    There is probable cause to believe that these materials and information exist at the BOSTONVIEW OFFICE because materials regarding the BOSTONVIEW APARTMENT's vendors, contracts, and financial documents are regularly kept in the BOSTONVIEW OFFICES (see below).

101.    In or about March 2013, I was informed by SUSANNE ROGERS that BVC business records are stored within the BOSTONVIEW OFFICE. Further, during the course of this investigation, and based upon my and other agents' conversations with vendors that have provided goods and services to the Church and the BOSTONVIEW APARTMENTS, I am aware that it was a common practice for such vendors (including Metro City Painting Services, Lovely Pets, Inc., Superior Plumbing Inc., and Nightingale Construction Co. Inc.) to send Church and/or BVC invoices to the BOSTONVIEW OFFICE via fax, electronic mail and/or regular mail.

102.    Also, in my experience in conducting financial investigations and in the experience of other agents with whom I have discussed this matter, it is normal and customary for businesses to maintain diaries, appointment logs and calendars, telephone records, and materials detailing contacts, meetings and arrangements with other business associates for years after their creation or receipt. These records contain vast amounts of material useful to running businesses day-to-day, and consequently are kept close at hand. Further, such records often contain information about legitimate business operations that help document expenses and deductions for operating and tax purposes. In particular, with respect to business records, business offices generally maintain their business records at their place of business for easy employee access and convenience, and to manage the day-to-day affairs of the business – this

-48-

includes records of past years' events, so that local business officers readily can access how they treated matters in the past.

### C. MACKENZIE RESIDENCE

103. The records and items sought from the MACKENZIE RESIDENCE are more particularly described as the evidence, fruits and instrumentalities of the specified federal offenses, to include:

a. Workpapers; schedules; actual, draft, blank or partial tax returns; and memoranda, records and correspondence relating to the preparation of the tax returns of MACKENZIE from January 1, 2007 to present.

b. Records and items reflecting the financial status (the origin, receipt, disbursement and concealment of funds) of MACKENZIE and MACKENZIE CONSTRUCTION, E/M/R/. and E/M from January 1, 2007 to present, including:

> bank statements, statements of brokerage accounts, cash; cancelled checks, deposit and withdrawal records; bills and receipts for taxes, mortgage payments, utilities, phone, and credit card receipts; payroll and commission records, general ledgers and journals, accounts payable and receivable ledgers, purchase, receipt and disbursement journals, paid bills and invoices, financial and disclosure statements, certificates of incorporation; correspondence, memoranda, mailing records; telephone diaries and message pads; handwritten notes, appointment books, planners and calendars; and

c. Documents, records, correspondence, emails, memoranda, notes and other information pertaining to, from January 1, 2002 to:

|    | Individuals |    | Entities |
|----|-------------|----|----------|
| a. | Courtney Mackenzie (relating to Courmac Realty Trust, the Boston Society of the New Jerusalem, and BostonView Corp.) | r. | The Boston Society of the New Jerusalem |
|    |  | s. | BostonView Corp. |
|    |  | t. | Bostonview Apartments |
| b. | Krystal Donnelly (aka Krystal MacDonald) | u. | Fillabuster Catering Trust |
|    |  | v. | Fillabusta Food Service |
| c. | Thomas J. Kennedy | w. | Courmac Realty Trust |
| d. | John Burke | x. | Mackenzie Construction |
| e. | Doug Hanson | y. | E/M/R (aka E/M) [real estate |

| Individuals | | Entities | |
|---|---|---|---|
| f. | Michael Snedecker | | consulting and construction] |
| g. | Jack Snedecker | z. | Harborview Real Estate |
| h. | Martin Raffol | | Corporation |
| i. | Mathew Raffol | aa. | Space Propulsion Systems, Inc. |
| j. | Lindsey Raffol | bb. | MZA Trust |
| k. | Michael Travers | cc. | Boston Society of the New |
| l. | Robert Hynes | | Jerusalem, Inc. (P.O. Box |
| m. | Michael Perry | | 961071) |
| n. | Peter O'Connell | dd. | BVC Trust |
| o. | Al Nugent | ee. | Looney & Grossman |
| p. | Tina Burm | ff. | Low Overhead Discount Carpet |
| q. | Juan Figueroa | gg. | Metro City Painting Services, Inc. |
| r. | Mark Palluccio | hh. | ASAP Plumbing and Heating |
| s. | Steven Bourgoin | ii. | Superior Plumbing Inc. |
| t. | Larry Reardon | jj. | Nightingale Construction Co. Inc. |
| u. | Marianne Baker | kk. | Lovely Pets, Inc.; |
| v. | John Baker | | |
| w. | Will Rodrigues | | |
| x. | Christopher Hebert | | |
| y. | Thomas DeRosa | | |
| z. | William Lane | | |
| aa. | David Doherty | | |
| bb. | Stephen Richmond | | |
| cc. | John Southern | | |
| dd. | Steven (aka Glenn S.) Ellis | | |
| ee. | Rex Ellis | | |

d.      U.S. currency; and

e.      Oxycodone, and documents and records relating to oxycodone distribution.

104.     I submit that there is probable cause to believe that the materials sought will be

present at the MACKENZIE RESIDENCE.  Surveillance conducted on April 11, 2013 and on

April 25, 2013 observed a vehicle registered in MACKENZIE's name (a black 2012 Nissan

Maxima registered in MACKENZIE's name and address) parked outside the MACKENZIE

RESIDENCE, indicating that MACKENZIE continues to use the MACKENZIE residence.

Moreover, I have reviewed certain bank records that reveal that MACKENZIE has received

regular monthly records of his bank accounts (such as bank statements and canceled checks) at

the MACKENZIE RESIDENCE. MACKENZIE's prescription records that were obtained by

the DEA Agents showed that, as of March 8, 2013, MACKENZIE had regularly filled his

oxycodone prescriptions by listing the MACKENZIE RESIDENCE as his address.

MACKENZIE's U.S. Individual Income Tax Return Forms 1040 for the tax years 2007 to 2011

listed the MACKENZIE RESIDENCE as MACKENZIE's address. Most recently, on or about

February 18, 2013, MACKENZIE signed his U.S. Individual Income Tax Return Form 1030 for

the tax year 2011, which was then filed by mail in an envelope to the IRS on or about March 7,

2013, with the MACKENZIE RESIDENCE as the return address on such envelope.

Accordingly, it is likely that MACKENZIE maintains, and continues to maintain on an ongoing

basis, records of his transactions at the MACKENZIE RESIDENCE, including materials relating

to the receipt and subsequent disposition of money.

105. Further, based upon my and other agents' interviews with the subjects of this

investigation (including the PAINTERS, the FOREMAN, the CONTRACTOR, and the

AQUARIUM OWNER) I am informed that MACKENZIE used the MACKENZIE residence as

a base to receive corrupt goods and services (e.g., the Third Fish Tank and maintenance, and

renovations from the CONTRACTOR after a fish tank leak were performed at the MACKENZIE

RESIDENCE) and to receive cash (e.g., the PAINTERS would on occasion hand MACKENZIE

cash at the MACKENZIE RESIDENCE; and the FOREMAN and the CONTRACTOR met

MACKENZIE near the MACKENZIE RESIDENCE to deliver cash kickbacks). In addition, not

only do MACKENZIE's prescription records tie oxycodone to the MACKENZIE RESIDENCE,

I am informed by the DEA Agents that the CS disclosed that MACKENZIE provides oxycodone

to one of MACKENZIE's girlfriends at the MACKENZIE residence.

106.     Furthermore, in my experience in conducting financial investigations and in the experience of other agents with whom I have discussed this matter, it is normal and customary for businesspeople like MACKENZIE to maintain diaries, appointment logs and calendars, telephone records, and materials detailing contacts, meetings and arrangements with other business associates for years after their creation or receipt. These records contain vast amounts of material useful to running businesses day-to-day, and consequently are kept close at hand, for instance at a person's residence or place of business.

107.     Also, in my experience in conducting financial investigations and the experience of agents with whom I have discussed this matter, people generally maintain their personal financial records at home. I have further found that individuals generally maintain personal financial records in their residence for the purpose of preparing to file tax returns and dealing with other personal financial matters. In this regard, Title 26, United States Code, Section 6001, requires that every person liable for any tax, or for the collection of tax, keep such records as are prescribed by IRS regulation. IRS regulations require that any person subject to tax keep "such permanent books of account or records . . . as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person." 26 C.F.R. § 1.6001-1(a). These records must be retained "so long as the contents thereof may become material in the administration of any internal revenue law." 26 C.F.R. § 1.6001-1(e). Therefore, there is probable cause to believe that MACKENZIE maintains the above sought-after materials at the MACKENZIE RESIDENCE

**Computers**

108.    As execution of prior warrants has shown, and as I have learned myself and been advised by other agents, it is now common for individuals and organizations, to keep financial and other records on computers, both fixed and portable, and to use computers to communicate with others. A review of MACKENZIE's 2010 tax returns prepared by Richard Murphy and Associates reveals that MACKENZIE had filed returns through this accounting firm electronically. Business records for Metro City Painting Services, Inc. and Superior Plumbing Inc. showed that MACKENZIE received bid proposals, contract documents, and other business correspondence via his electronic mail account, emacke3548@aol.com. Moreover, I am informed by Church Treasurer SUSANNE ROGERS that the CHURCH regularly conducts business via computers and electronic mail, and that the CHURCH owns multiple computers and maintains hard copies of printed electronic mails as part of the business records kept within the CHURCH. The CHURCH also maintains an internet site, as noted above. Finally, I am informed by ROGERS that the BOSTONVIEW OFFICE has computers and regularly conducts business via computers and electronic mail. In the course of this investigation, I have reviewed electronic mails that were generated at the BOSTONVIEW OFFICE in connection with Metro City Painting Services, Inc. and Superior Plumbing Inc. For all of the above reasons, therefore, there is probable cause to believe that computers and computer equipment were used in conjunction with the specified federal offenses and exist at the subject locations.

109.    I have learned from an FBI computer specialist, who has received training in the execution of search warrants involving computers and related equipment, electronic data preparation, and the recovery, documentation and authentication of evidence that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy

-53-

disks, compact disks, magnetic tapes and memory chips. I also know that, during the search of a premises, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

(a)     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

(b)     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover hidden, erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain booby traps that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

(c)     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers.

-54-

(d)      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension .jpg often are image files; however, a user can easily change the extension to .txt to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a dongle or keycard, is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called steganography. For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

110.    In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

(a) Upon securing the premises, law enforcement personnel will copy or secure an image of computer media containing items, materials and evidence sought by the warrant and promptly transport such material to an appropriate law enforcement laboratory for review. If unable to copy or image such material, law enforcement personnel will seize the computer equipment and storage devices and promptly transport such material to an appropriate law enforcement laboratory for review. Such computer media, equipment and storage devices will be reviewed by appropriately trained personnel ("the computer personnel") in order to extract and seize any data that falls within the list of items to be seized.

-55-

(b)    In searching the data, the computer personnel may examine all of the data contained in the computer media, equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover deleted, hidden or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

(c) If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise properly seized, the government will return these items within a reasonable period of time.

111.    In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

(a)    Any computer equipment and storage device capable of being used to store the documents, materials and evidence listed above in paragraphs 94, 99, and 103;

(b)    Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of the documents, materials and evidence listed above in paragraphs 94, 99, and 103, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

(c)    Any magnetic, electronic or optical storage device capable of storing the documents, materials and evidence listed above in paragraphs 94, 99, and 103, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

(d)     Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

(e)     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

(f)     Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

(g)     Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

112.    In sum, I have probable cause to believe that evidence, fruits and instrumentalities of the specified federal offenses exist at the subject locations.

**Sealing of Papers Relating to the Proposed Searches**

113.   It is also respectfully requested that this Court issue orders that, with the

exception of a copy of the search warrant and inventory that will be left at each of the subject

locations, the documents upon which the search warrants are based and all other papers related to

the applications, including the Applications, Affidavits, Search Warrants, and Inventories, be

filed under, and are hereby sealed, until further order of this Court.  The evidence to be seized

and the information upon which the applications are based is relevant to an ongoing grand jury

investigation and premature disclosure of the affidavits and related documents likely may have a

negative impact on other aspects of the investigation and may jeopardize its effectiveness.


KRISTA L. CORR, Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this 1st[th] day of May, 2013


HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

-58-

# EXHIBIT A





# EXHIBIT B



955 Pleasant Street, Unit 1
East Weymouth, MA 02189





